FAYETTEVILLE DIAGNOSTIC CLINIC, LTD.
*v.* Dyanna TURNER

00-1285                                                    42 S.W.3d 420

Supreme Court of Arkansas
Opinion delivered April 26, 2001

*Bassett Law Firm*, by: *Cutis L. Nebben* and *Vince Chadick*, for appellant.

*Harry McDermott*, for appellee.

W.H. "DUB" ARNOLD, Chief Justice. This is a slip-and-fall case. It arises out of an injury Dyanna Turner, appellee, sustained while on the premises of appellant, Fayetteville Diagnostic Clinic (FDC), on December 18, 1995. Turner sued FDC in tort to recover damages. At the close of a one-day trial, the jury found FDC negligent and returned a $48,703 judgment. FDC then filed a motion for judgment notwithstanding the verdict (JNOV), a motion for remittitur, and a motion for a new trial, all of which were denied by order of the trial judge. FDC argues on appeal that there was insufficient evidence to support the verdict. FDC also argues, in the alternative, that the amount of the award is contrary to the preponderance of the evidence. We disagree and affirm.

The Arkansas Court of Appeals, in a 4-2 decision, reversed and remanded the case to the trial court, holding that there was not substantial evidence from which the jury could have inferred that FDC was negligent. *Fayetteville Diagnostic v. Turner*, 71 Ark. App.

259, 29 S.W.3d 773 (2000). Appellee Dyanna Turner then petitioned this Court for review, contending that the Court of Appeals' decision is in direct conflict with prior holdings of this Court, in that the majority of the Court of Appeals refused to review the evidence in the light most favorable to the appellee and give the evidence it highest probative value in favor of the jury verdict, thereby ignoring the proper standard of review. Our jurisdiction is proper pursuant to Ark. Sup. Ct. R. 1-2(e)(ii). We agree with appellee and affirm the trial court, thereby reversing the Court of Appeals' decision.

## I. Standard of Review

On a petition for review, this Court reviews the case as if the appeal had originally been filed in this Court. *Thompson v. State*, 342 Ark. 365, 28 S.W.3d 290 (2000); *Muhammad v. State*, 337 Ark. 291, 988 S.W.2d 17 (1999); *State v. Brunson*, 327 Ark. 567, 570, 940 S.W.2d 440 (1997); *Mullinax v. State*, 327 Ark. 41, 938 S.W.2d 801 (1997). We have repeatedly held that a directed-verdict motion is a challenge to the sufficiency of the evidence, and, when reviewing a denial of a motion for a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *Pettus v. McDonald II*, 343 Ark. 507, 36 S.W.3d 745 (2001); *Farm Bur. Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000); *State Auto Prop. & Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999). Substantial evidence is evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond mere suspicion or conjecture. *Id.* We review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.* A motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000); *Wal-Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991). A motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Id.* Under those circumstances, a jury question is presented and a directed verdict is inappropriate. *Id.* It is not this Court's province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict. *Id.*; *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481 (2000).

■ We have stated that a motion for JNOV is technically only a renewal of the motion for a directed verdict made at the close of the evidence. *Wheeler Motor Co., Inc. v. Roth*, 315 Ark. 318, 867 S.W.2d 446 (1993). Accordingly, we are also governed by the rule that a trial court may enter judgment notwithstanding the verdict only if there is no substantial evidence to support the jury verdict and the moving party is entitled to judgment as a matter of law. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999); *Schmidt v. Pearson, Evans & Chadwick*, 326 Ark. 499, 931 S.W.2d 774 (1996).

## II. Substantial Evidence

■■ The principles that govern slip–and–fall cases have been frequently stated by this court. Those principles are set against the general backdrop that an owner has a duty to exercise ordinary care to maintain the premises in a reasonably safe condition for the benefit of invitees. *Conagra, Inc. v. Strother, supra; Morehart v. Dillard Dep't Stores*, 322 Ark. 290, 908 S.W.2d 331 (1995); *Black v. Wal-Mart Stores, Inc.*, 316 Ark. 418, 872 S.W.2d 56 (1994). To establish a violation of that duty, the plaintiff must prove either: (1) that the presence of a substance upon the floor was the result of the defendant's negligence, or (2) the substance had been on the floor for such a length of time that the defendant knew or reasonably should have known of its presence and failed to use ordinary care to remove it. *Wilson v. J. Wade Quinn Co.*, 330 Ark. 306, 952 S.W.2d 167 (1997); *Kelly v. National Union Fire Ins. Co.*, 327 Ark. 329, 937 S.W.2d 660 (1997); *Brunt v. Food 4 Less, Inc.*, 318 Ark. 427, 885 S.W.2d 894 (1994) (*quoting Derrick v. Mexico Chiquito, Inc.*, 307 Ark. 217, 819 S.W.2d 4 (1991)). The mere fact that a person slips and falls does not give rise to an inference of negligence. *Brunt v. Food 4 Less, Inc., supra.*

The facts of the case at bar are as follows. On December 18, 1995, Turner went to FDC for a scheduled appointment with Dr. Britt Mahan. While walking in the hallway toward the elevator, Turner fell. After her fall, Turner was placed in a wheelchair and taken to see Dr. Mahan. Dr. Mahan took an x-ray of Turner's knee and sent her to Dr. Tom Patrick Coker, an orthopaedic specialist located on the same campus as FDC. Dr. Coker placed appellee's knee in a velcro cast and gave her crutches. He treated her injury conservatively and released her from treatment after four months.

Following Dr. Coker's release, Turner sought treatment from a pain psychologist. She returned to Dr. Coker in November 1996,

and complained of aching, swelling, and burning. However, Turner's treatment from Dr. Coker was not successful. Turner went without treatment from November 1996 until September of 1997. At that time, she went to see Dr. Ken Rosenzweig. Turner told Dr. Rosenzweig that she had continuously experienced knee pain since her December 18, 1995, fall. Dr. Rosenzweig operated on her knee on October 17, 1997, and diagnosed her condition as severe patellofemoral syndrome, torn cartilage, and a mild amount of inflammation of the lining of the joint. As a result, Dr. Rosenzweig smoothed the rough edges and surfaces inside appellee's knee joint, removed torn cartilage, and cut a ligament that was holding down her kneecap too tight.

Turner then filed the instant cause of action. At the trial Turner testified that she injured her knee at FDC while walking toward the elevator. She stated that she was walking past the women's bathroom when she slipped and fell on water that came from beneath the bathroom door. She also testified that although she did not see the water on the floor when she fell, she saw the water on the floor after she fell, and that no warning signs were posted indicating the area was wet. According to Turner, several people saw her fall, and she remained on the floor for eight to ten minutes. Turner told the jury that after she fell, employees of FDC came up to her and helped her into a wheelchair. Once in the wheelchair, Turner stated that a doctor wheeled her to Dr. Mahan's office. Turner testified that Dr. Mahan told her that he was aware of the slippery condition around the bathroom, apologized to her, and stated that the clinic would take full responsibility for everything.

Amy Cruise, Turner's niece, testified that she and a friend gave Turner a ride to the clinic. Cruise also testified that after she visited her obstetrician, who was located in the same medical complex, she walked over to FDC to see if Turner was finished. Cruise testified that she saw her aunt was on the floor in front of the women's bathroom, and saw water on the floor beside her. On cross examination, Cruise admitted that she did not see her aunt fall or accompany her aunt to see Dr. Mahan.

At the close of Turner's case, FDC moved for a directed verdict, arguing that Turner failed to prove that the water on the floor was the result of appellant's negligence or how long the water was on the floor. Turner responded that she presented evidence that Dr. Mahan knew the floor was slippery, apologized for the condition of the floor, and took full responsibility for it. The trial court denied the motion and commented that although Turner presented

evidence that Mahan knew the floor was slippery, she failed to present any evidence that Mahan knew there was water in front of the bathroom door on the date in question.

Following denial of FDC's motion for directed verdict, the jury heard testimony from Brenda Tooley and Dr. Mahan, and rebuttal testimony from appellee. Brenda Tooley, an employee of FDC, testified that she did not see Turner fall, but was aware of the general vicinity where Turner fell. She stated she was not aware of any maintenance or plumbing work conducted around the bathroom area the months before, during or after Turner's fall. On cross examination, Tooley admitted she was *not on the premises* on the day Turner fell.

Dr. Mahan, an employee and shareholder of FDC, testified for FDC. Mahan told the court he was scheduled to examine Turner for stomach problems on the date of her fall, but as a result of the fall attended to Turner's immediate injury. On direct examination, Mahan stated that he wrote in his medical report that "[Turner] did slip on our tile floor while in the bathroom." However, on cross, Mahan stated his medical report indicated that "[Turner] slipped coming from the wet outer environment," and that the report "sounds like she slipped coming in from the wet environment. She told me she slipped around the bathroom."

Mahan also testified that he wrote in his medical records that as a result of Turner's fall, she sustained bruising and pain in the left knee initially, and that although Turner could bear it, she preferred sitting in a wheelchair. Mahan told the jury that although his medical report did not indicate it, the x-ray taken of Turner's kneecap showed that the kneecap was fractured. Mahan further testified that his medical report stated there was no swelling in Turner's left knee, which directly contradicted Dr. Coker's findings. The x-ray report was not included in Turner's medical chart. Dr. Mahan denied apologizing to Turner, and told the jury he had "no explanation" as to why there was no medical record of his conversations or contact with Turner after she returned to see him with her x-rays. He testified that he had no information or knowledge that the floor was slippery and denied that appellee told him the floor was slippery.

Dr. Mahan stated that although the average doctor at FDC saw twenty patients a week, he saw seventy or eighty patients within a week, and that the only memory he had of what happened came from his medical report. He stated that even though he normally

dictated information to add to the medical chart, either the dictation did not exist or the report may have been transcribed and not placed in the chart where it could be found. Mahan testified that when he told Turner he would take care of her, he meant he would take care of her medically. Finally, Mahan stated that he had no knowledge of the condition of the floor on December 18, 1995, and that he had no memory of going to the lobby area on that date.

Following the close of the evidence, FDC again moved for a directed verdict, arguing that no evidence was presented that the water on the floor was the result of FDC's negligence or that the water came from the bathroom. Counsel for Turner responded that she proved negligence because an employee of FDC (Dr. Mahan) was aware of the floor's condition and took responsibility for it. The court denied the motion for directed verdict, stating that it appeared to be a question of credibility between Dyanna Turner's testimony and that of Dr. Mahan and, therefore, must then be submitted to the jury. The jury returned a verdict in favor of plaintiff for $48,703, and the trial court denied the posttrial motions previously mentioned.

▄▄▄ The appellant contends (and the Court of Appeals held) that this jury verdict should be reversed because there was not substantial evidence from which the jury could have inferred that FDC was aware of the condition that caused appellee's fall and that it failed to take any corrective action to prevent said fall. We disagree. We hold that there was substantial evidence from which the jury could have inferred that Dr. Mahan, as one of the owners of FDC, was aware of the condition that caused appellee's fall and that he failed to take any corrective action.

▄▄▄ Ms. Turner testified that Dr. Mahan told her that he knew the floor down around the bathroom was slippery and that "they," meaning FDC, would take care of everything. According to Dr. Mahan, he never told Ms. Turner he was aware of the condition of the floor. In reviewing the evidence, we have consistently held that we do not pass upon the weight and the credibility of the evidence, as such determinations remain within the province of the jury. *See Griffen v. Woodall*, 319 Ark. 383, 892 S.W.2d 451 (1995); *Hall v. Grimmett*, 318 Ark. 309, 885 S.W.2d 297 (1994). Moreover, jurors are entitled to take into the jury box their common sense and experience in the ordinary affairs of life. *Palmer v. Myklebust*, 244 Ark. 5, 424 S.W.2d 169 (1968); *Rogers v. Stillman*, 223 Ark. 779, 268 S.W.2d 614 (1954).

██ Given the substantial-evidence standard, reviewing the evidence and all inferences in favor of the jury's verdict, Dr. Mahan's statement is sufficient to allow the verdict to stand. From Ms. Turner's testimony that Dr. Mahan admitted he knew the floor down around the bathroom was slippery, the jury could have inferred that the slippery condition of the floor around the bathroom had existed for such a length of time that the premises owner (Dr. Mahan — an employee working on the second floor, when the bathroom was located on the first floor of the building) knew of its presence and failed to use ordinary care to correct it. Furthermore, if believed, Ms. Turner's testimony that Dr. Mahan stated that he knew the floor around the bathroom was slippery was a reasonable basis from which the jury could have inferred Dr. Mahan knew *why* the floor down around the bathroom was slippery. These are entirely reasonable inferences from the evidence presented and are all that is required to meet the substantial-evidence standard.

For these reasons, this Court cannot say that the trial court clearly erred when it allowed the case to go to the jury.

## III. Remittitur

██ Regarding when a remittitur is appropriate, we held in *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999):

> When an award of damages is alleged on appeal to be excessive, we review the proof and all reasonable inferences most favorable to the appellee and determine whether the verdict is so great as to shock our conscience or demonstrate passion or prejudice on the part of the jury. *Builder's Transp., Inc. v. Wilson*, 323 Ark. 327, 914 S.W.2d 742 (1996).

*Id.* at 551.

Appellee introduced evidence that she suffered the pain and inconvenience of a fractured kneecap for four months. She testified she additionally suffered pain and inconvenience of an untreated torn cartilage for over three years. Appellee testified that her knee was still giving her problems and that it hurt her to walk.

Dr. Rosenzweig testified that appellee's knee had severe erosion and that there was objective evidence for her pain. He testified that the $10,000 in medical bills appellee had incurred were reasonable and related to her fall. He testified that appellee had a 15

percent permanent impairment to her knee as a result of her fall. He further testified that with a reasonable degree of medical certainty, the appellee would require some form of medical treatment in the future for her knee because she had areas of complete delamination of cartilage to exposed bone. Without objection from FDC, Dr. Rosenzweig testified that, more than likely, appellee would need further arthroscopic treatment which would cost what she paid to him for her first arthroscopic surgery which was around $10,000.

▇▇ Clearly, there was substantial evidence before the jury to justify its award of $48,703 in damage for the appellee's present and future pain and suffering, present and future medical bills, and for the permanent disability to her knee. As such, we cannot say that this amount "shocks the conscience" of the court, as it is clearly justifiable pursuant to Dr. Rosenzweig's testimony and does not demonstrate any level of passion or prejudice on the part of the jury.

Affirmed.