TYSON FOODS, INC. *v.* Don DAVIS

01-165 66 S.W.3d 568

Supreme Court of Arkansas
Opinion delivered February 7, 2002

570

*Dover & Dixon, P.A.*, by: *Michael R. Johns, Thomas S. Stone,* and *Patrick E. Hollingsworth,* for appellant.

*Lingle & Fulcher, PLLC,* by: *H. Clay Fulcher* and *James G. Lingle; Lonnie Turner;* and *Mainard & McCain,* by: *James Mainard,* for appellee.

JIM HANNAH, Justice. Tyson Foods, Inc., appeals a judgment entered on a jury verdict in Franklin County Circuit Court finding Tyson liable to Don Davis for $891,660 in damages. The trial judge gave instructions to the jury on fraud, promissory estoppel, and negligence, and the matter was submitted to the jury on these issues on a general jury verdict form. Tyson alleges the fraud and promissory estoppel causes of action were precluded by the statute of limitations and should not have been submitted to the jury. Tyson also alleges that Don Davis knew or should have known of alleged misrepresentations by Tyson when he signed a contract that did not reflect what he alleges he was told. Tyson further argues that by signing the contract, Davis waived any claim of misrepresentations because the contract contained the full agreement between the parties. Tyson additionally asserts that Davis failed to present substantial evidence of justifiable reliance on the alleged misrepresentations of Tyson, that there was also a lack of substantial evidence of damages, that the jury was incorrectly instructed on damages, and finally that the amount of the verdict is not supported by substantial evidence. We disagree.

We hold Davis's claims were not precluded by the statute of limitations, that the issues submitted to the jury were supported by substantial evidence, that the directed verdict motions were properly denied, and that the case was properly submitted to the jury.

*Facts*

This case arises from a decision by Tyson to seek hog growers in Arkansas to raise hogs in a bedded-floor program.[1] Tyson argues that the bedded-floor program was never represented to be anything other than a stop-gap program that would only last a year or so until more traditional finishing units with concrete-slatted floors were built in Missouri to handle the feeder pigs coming off Tyson's sow operations in Oklahoma. Davis argues that Tyson was desperate for growers because of the delays with the completion of the Missouri

---

[1] A bedded-floor program is a process of raising hogs indoors on a dirt floor that is covered with sixteen to eighteen inches of "bedding" consisting of either wood shavings, wood shavings combined with straw, or rice hulls. The bedded-floor program could be implemented in empty poultry houses.

finishing units, that Tyson did not have enough capacity to handle their feeder pigs, and that Tyson represented to him the bedded-floor program was here for the long term just as the bedded-floor program is in Tyson's poultry business. He alleges that Tyson encouraged him to enter into the business, and that he was induced to assume substantial debt and invest substantial sums that Tyson knew he could never recoup in a year or two of operations. The equipment required by Tyson had a ten year expected life.

The facts put before the jury are as follows. Tom Johnson was Tyson's regional manager for the central region in 1994. He testified that Tyson decided to expand its hog operation in late 1990 or early 1991. They found the opportunities to expand in Oklahoma and Missouri to be the most attractive and commenced construction of sow units in Oklahoma and finishing units in Missouri. Johnson testified that the pigs are born at the sow units and raised to a weight of about forty pounds over a period of five-and-a-half to seven weeks. Then the feeder pigs are transferred to the finishing units where they reach a market weight of 240 to 280 pounds.

According to Johnson, problems arose in completing the finishing units in Missouri when another producer there got into pollution problems, and the State of Missouri stopped issuing permits to operate waste lagoon systems. Johnson testified that the finishing units in Missouri were built on slatted concrete floors with the waste flushed out into lagoons. The lack of environmental permits kept the finishing units from coming on line when expected and meant more feeder pigs were being produced in the Oklahoma sow units than Tyson had room for in Missouri. It appears that although the feeder pigs could have been sold, the market in finishing out the hogs was very attractive at that time. Tyson therefore set out to try and accommodate the feeder pigs elsewhere.

Johnson testified that a Tyson employee had been to Scotland and found they were finishing hogs out on bedded floors rather than the slatted concrete floors. Johnson characterized the bedded system as "pretty much" the way poultry is raised in the United States. The bedded system apparently did not require the environmental permits because in the bedded system animal waste mixes with the bedding and is periodically removed collectively as a solid waste and spread on fields. As such, no lagoon system of emulsified animal waste is involved.

Again, according to Johnson's testimony, Tyson began looking at the bedded-floor system and considered journal articles discussing it. Johnson and another Tyson employee named John Thomas then went to a Missouri farm to observe the operation of a bedded-floor operation there. The farmer in Missouri reported to them that the efficiency of the system was similar to the traditional method on slatted floors. Johnson reported this information to his superior at Tyson, Bill Moeller. In the beginning of 1994, Tyson placed its first batch of feeder pigs on a bedded-floor operation at a farm in Green Forest, Arkansas. This batch was finished successfully in May of that year. Johnson testified that they were "pleasantly surprised" at the results which were similar to that represented by the Missouri farmer, and that another batch was placed on the farm in Green Forest. At this point, according to Johnson, Tyson decided to go forward with a bedded-floor program as a "temporary stop-gap measure until we could get things built in Missouri." Tyson estimated it would be another year before the units in Missouri would be operating. It turned out to be longer.

Johnson then testified that in the summer of 1994 he traveled to the Arkansas Pork Producers meeting in Fayetteville with hog farmer Roger Hammond. On their return trip, they discussed the bedded-floor program. According to Johnson, he told Hammond it was a temporary program that would run until the concrete-floor facilities in Missouri were completed, and that Hammond expressed an interest in the program. It appears that as a consequence of this conversation, Hammond approached Davis. According to Davis's testimony, he was approached by Hammond about either letting Hammond use his empty turkey houses or going into partnership raising hogs for Tyson on bedded floors in Davis's turkey houses. Davis testified that Hammond told him the program for Tyson would only be short term, a year or two, and that he determined it was not financially feasible over such a short time. Davis testified that he nonetheless thought the bedded-floor method of finishing hogs might provide a use for his empty turkey houses. He thought there might be options other than raising hogs for Tyson. Davis went on to testify that he then called Tyson to see if he could look at one of their bedded units to understand how they were operated. According to Davis, when he called Tyson, he was connected with Johnson who then asked if he would be interested in raising hogs for Tyson. According to Johnson, Davis was the one that expressed an interest in raising hogs for Tyson.

In any event, according to both men, they later met on Davis's farm to discuss the possibility. From this point, the facts diverge

significantly. Johnson testified that when they met at Davis's farm, he viewed the facilities and wrote out the changes and listed the equipment that would be required if Davis wanted to raise hogs for Tyson. The equipment Tyson required had a ten-year life. Johnson further testified that he told Davis he had authority for a one-year contract and no more, that there might be batch-to-batch contracts for less than a year thereafter, but there was no promise of such because it depended on when the Missouri finishing units could handle the feeder pigs being produced. Johnson specifically denied ever telling Davis they would provide hogs for twenty years or for his life, or that the bedded-floor program was long term, but rather he testified that he told Davis the bedded-floor program was a temporary stop-gap program that would last until the units in Missouri could handle the hogs.

Reece Hudson, a Tyson employee, was also present at this first meeting at the Davis farm in 1994. He testified consistently with Johnson that Davis was told that the program was temporary until the Missouri finishing units could take the feeder pigs. He denied the representation asserted by Davis that Tyson was in the bedded-floor program for the long term.

Davis told quite a different story in his testimony. He testified that when Johnson arrived at his farm, the first thing he asked Johnson was whether the program was short term as Hammond reported to him. Davis testified that Johnson told him that was not the case. Davis then testified further that he made it clear to Johnson that he was not interested in raising hogs short term, that it would get him in financial trouble, and that he needed twenty years or better. Davis testified that when he said this, Johnson told him "we only give year-to-year contracts to everybody we deal with. All of our operations, it's a year-to-year contract, the same as chicken growers. All they get is a year-to-year contract." Davis testified that Johnson also said at this same time, "We don't plan on going out of business. We plan on being here." Davis then went on to further testify that Johnson told him Tyson had been in business for "a bunch of years," and that "we plan on staying in the business and don't plan on going out," and "well I don't see any reason it won't last twenty years or till death do us part."

J.D. Rice, a neighbor, who happened to be present because he was trying to sell a manure spreader to Davis, testified that he could not hear all of the conversation, but that he did hear a discussion about "the growin' of the hogs," and how long it would last, and that Johnson told Davis "he would be growing hogs all his life if he

wanted to." Rice believed the conversation he overheard was in 1994, but stated it might have been later in 1996. Davis's banker, Don Stimpson, from whom Davis obtained his funding, testified that he called Johnson to confirm what Davis had told him, and testified that Johnson told him, "Don Davis was going to be able to grow hogs as long as he wants." The bank had never financed a swine operation but had financed Tyson poultry growers operating on short-term contracts, and that one of the Tyson poultry growers had been growing poultry for Tyson for thirty-five years. The bank loaned the money to Davis. Davis purchased and installed the equipment as required by Tyson.

The initial contract provided to Davis was for one year as Johnson had told him it would be. Davis testified that this contract was what he was expecting. Tyson delivered a batch of feeder pigs to Davis, and Davis started raising the pigs successfully. He testified, however, that in the Spring of 1995, when Tyson brought some individuals by to observe the operation, he overheard the Tyson employee telling those observing that the bedded-floor program was only short term. Davis then testified that he called Johnson and confronted him with this, but that Johnson told him nothing had changed, and that he had only heard a rumor. Davis more specifically testified that Johnson told him he had heard nothing from the "big wigs" about anything like that. Davis testified further that he also told Johnson at this time that he had heard the rumor elsewhere, but that Johnson again assured him the program was not about to end. Johnson in his testimony denied making such representations.

Davis further testified that he continued to receive inquiries from Johnson about whether he knew of any other facilities in which hogs might be placed in the bedded-floor program. He then testified that in the summer of 1995, Johnson came to his farm after Davis began to consider purchasing more land to raise more hogs. Davis asserts that he expressed concern about a continued supply of hogs and that Johnson told him at that time, "I'm going to have hogs . . . hogs is no problem. You'll get plenty of hogs. You'll have hogs." Davis testified that based upon this representation, he purchased another farm and received a one-year contract on the new farm in October 1995, which was the same as he had received on the original farm. Davis's brother-in-law William Admeyer was visiting and present when Davis had this conversation with Johnson. Admeyer testified that he overheard Johnson tell Davis the relationship was long term, "and he could purchase additional space for hogs." Admeyer did not recall discussion of a one-year contract.

Time passed, and Johnson was promoted. He was replaced by Jack Gorely in 1996 as regional manager and about this same time Hudson was also assigned as liaison to Davis's farm. Hudson testified that in late 1996, Davis asked him again and again about receiving hogs in the future, stating that he was promised pigs forever by Johnson. Hudson testified that he told Davis he understood it was for a "certain length of time" under his contract. Davis testified about this conversation very differently, that Hudson rather told him that he and Bill Moeller of Tyson had been out looking at the bedded-floor operations and that "they were doing good and that they was gonna be around for years to come." Tyson did continue to provide hogs to Davis on batch-to-batch contracts. It appears this occurred because there was more difficulty than anticipated in getting the Missouri finishing units operational.

The Davis operation was not without its problems. In late 1996, a visit to Davis's operation by Environmental Specialities at the request of Tyson resulted in a report stating, "This farm was in as bad of a condition of any I have ever visited." The testimony showed that as a consequence of wet weather and inadequate ventilation, the hogs had nowhere to get out of the wet, and that many were literally swimming in waste. This report was received by Tyson in early 1997. Tyson then required Davis to install a system to evaporate the moisture and get the farm back into an acceptable condition. Davis installed the system. Davis testified that the ventilation system cost him $60,000 to $70,000 and he lost $60,000 to $70,000 because he was unable to grow hogs while he was installing the ventilation system. Davis testified Gorely told him Tyson was requiring all growers like him to install such a system. There had been significant problems with disease. Davis continued to have problems that he claimed was a result of the ventilation system being improperly designed. Tyson claimed the problems resulted not from an improperly designed ventilation system, but rather from the improper installation and operation of the ventilation system.

Davis then testified that in December of 1998 he was told there would be no more hogs. He was just finishing a batch at that time. Davis asserted that it was at this point that he recognized that Tyson had been misrepresenting the bedded-floor program, and that there would be no more hogs. Johnson testified that Tyson went out of the bedded-floor program at this time because it was not cost competitive. He denied it was because there was no longer a need for housing.

Davis asserted he had been led to believe Tyson intended to be in the bedded-floor hog program for the indefinite future as they had been in the poultry business. He testified that he understood he could anticipate receiving more hogs as long as he did a good job. He filed suit on February 24, 1999, slightly over two years after he asserts Hudson last assured him Tyson intended to remain in the bedded-floor program for the long term. This was within months of when he asserts he was told by Tyson that they would no longer provide him with hogs, and when he first learned that Tyson had misrepresented to him that the bedded-floor operation was a long-term program. These are the facts that were placed before the jury. The jury was instructed on negligence, fraud, and promissory estoppel. The jury received a general verdict form and returned it finding for Don Davis for damages in the amount of $891,660.

### Contracts

Tyson attempts to analyze this case as a contract case, alleging that because the contracts did not reflect the obligation to provide hogs to Davis long term, its directed-verdict motion should have been granted. Davis's argument, however, is not that there was a contractual obligation to provide him personally with hogs long term, but rather that he was induced to enter into bedded-floor hog production for Tyson because of misrepresentations by Tyson of its market for such production.

The contracts and their contents cast no light on the issue of the representations made by Tyson because Davis was expecting precisely the short-term contracts he received. Tyson argues that Davis is asserting modification of the short-term contracts when he argues he was promised hogs long term. This is a red herring. Davis argues that he was misled and enticed to enter into significant debt and investment to Tyson's benefit based upon the representations they were going to be in the bedded-floor hog business long term. Such a manner of contracting by short-term contracts was the custom in Tyson's poultry business. The validity of this conclusion was born out by the testimony of Don Stimpson, Davis's banker. Davis alleged fraud or deceit was based on the representation that Tyson was in the bedded-floor program long term. The issue is a fraud cause of action, not a contract cause of action.

The allegation and instructions to the jury were on fraud and promissory estoppel, not contract. Davis alleges that Tyson represented to him that they were entering the bedded-floor production

of hogs in the same way they were in the poultry business and that the pigs would be on a year-to-year or a batch contract. Davis alleges that he was told Tyson would be needing growers raising hogs on bedded floors long term just as they needed growers in the poultry business. He further alleges that Tyson induced him to enter into the business and incur significant debt which Tyson knew was to his financial destruction, but which inured to Tyson's benefit in having a place to put its feeder hogs in the short term until their finishing units in Missouri came on line. Davis further alleges that based upon Tyson's representation of the market with Tyson, he purchased land, and expanded his operation when Tyson knew the bedded-floor program was short term and would be terminated as soon as the finishing units in Missouri were completed. The evidence on these issues was in substantial conflict as submitted to the jury, and the jury found for Davis.

■ This is a misrepresentation, fraud, or promissory estoppel cause of action, not a contract cause of action.

### General Jury Verdict

■ Davis's complaint alleged negligence, fraud, and promissory estoppel. The jury was instructed on all three theories. However, the case was submitted to the jury on a general verdict form, which was returned by the jury, and states, "We the jury find for Don Davis on his claim for damages and award damages against Tyson Foods, Inc. in the amount of $891,660." Where the jury's verdict is rendered on a general verdict form, it is an indivisible entity or, in other words, a finding upon the whole case. *J. E. Merit Construction Inc. v. Cooper*, 345 Ark. 136, 44 S.W.3d 336 (2001); *Pearson v. Hendrickson*, 336 Ark. 12, 983 S.W.2d 419 (1999); *The Home Co. v. Lammers*, 221 Ark. 311, 254 S.W.2d 65 (1952).

■ We note that the negligence cause of action goes only to the ventilation system and that the award exceeds the amount both parties agree constitutes the damages allegations as to the ventilation system. Therefore, Tyson argues that if Tyson were to prevail on the statute of limitations argument on fraud or promissory estoppel, the award could not be sustained. However, this court has no means to determine how damages were assessed, whether based on negligence, fraud, promissory estoppel, or some combination thereof. Where a general jury verdict is used, this court will not speculate on what the jury found. *Primm v. U.S. Fidelity Guaranty Ins. Corp.*, 324 Ark. 409, 922 S.W.2d 319 (1996). To prevail in arguing that the

award is too great to be sustained on the negligence cause of action, Tyson must show that the statute of limitations ran as to both fraud and promissory estoppel.

■ This is the problem presented by a general verdict form in this case. When special interrogatories concerning liability or damages are not requested, we are left in the position of not knowing the basis for the jury's verdict, and we will not question nor theorize about the jury's findings. *Esry v. Carden*, 328 Ark. 153, 942 S.W.2d 846 (1997); *Jefferson Hosp. Assn. v. Garrett*, 304 Ark. 679, 804 S.W.2d 711 (1991).

*Fraud*

■ Fundamental to an understanding of this case is recognizing the distinctions between what each party asserts as the role the contracts play in this case. Tyson argues that Davis is asserting an oral modification to the one-year written contracts. Tyson asserts that this alleged modification is an agreement to provide Davis with feeder hogs for life. Based upon this theory, Tyson argues that at the latest in October 1995, Davis knew there was no such obligation because the one-year contract on the new farm executed at that time contained no such obligation. In essence, Tyson argues that the contract controlled the relationship between them and shows there was no such agreement to provide hogs for life. It is true that as a general proposition of the common law, in the absence of fraud, accident or mistake, a written contract merges, and thereby extinguishes, all prior and contemporaneous negotiations, understandings and verbal agreements on the same subject. *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 343 Ark. 224, 33 S.W.3d 128 (2000). That could mean that all understandings arising prior to the October 1995 contracts were merged within that document. However, this argument presupposes that this is simply a contractual dispute, which it is not.

Davis counters that the written contracts provided were precisely what Tyson represented they would provide, and what he expected, because Johnson represented to him that the bedded-hog program would be handled like the poultry programs where the contracts would be one year or less but where Tyson was in the business and provided poultry for the long term. The evidence showed some poultry growers had been raising poultry for Tyson for thirty years under such short-term contracts.

Davis asserts fraud or deceit in that Tyson misrepresented that they were going to be in the bedded-floor hog program indefinitely as they had been in the poultry business and in encouraging him to enter into the business and incur substantial debt and financial investment that the program could not sustain. Davis does not argue the promise of hogs for life was a contractual obligation. He testified he recognized he would not receive hogs if he was not successfully raising them, and thus acknowledged he did not believe he had an enforceable lifetime contractual right to hogs that he might enforce in court. Davis rather alleges he was induced to incur debt and set up his farm to raise hogs on a bedded-floor business, all to Tyson's benefit, because they lied to him to get him to start the business even though they knew the bedded-floor program would never last long enough to allow Davis to clear his debt.

It might be argued that Davis could have raised hogs for others. The evidence put before the jury showed this bedded-floor program was experimental, and Davis testified that other producers who utilized the bedded-floor program were not available. He also testified that he would have had to go to the lagoon system to receive hogs from other producers and that would require substantial alteration to the facilities and environmental permits. Thus, Davis asserted fraud or deceit, and the jury was so instructed.

The tort of fraud or deceit consists of five elements that the plaintiff must prove by a preponderance of the evidence: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Ultracuts Ltd., supra*; *Medlock v. Burden*, 321 Ark. 269, 273, 900 S.W.2d 552 (1995).

Thus, an element of fraud is damages. Davis suffered no injury from the alleged deceit until he was told by Tyson in 1998 that he would receive no more hogs. He was also then told for the first time by Tyson that contrary to what Tyson had been saying, Tyson was going out of the bedded-floor business. Damages are an essential element of fraud, and there must be an allegation of sufficient facts to satisfy those elements or the case is subject to a motion to dismiss. *McAdams v. Ellington*, 333 Ark. 362, 970 S.W.2d 203 (1998). False or fraudulent representations not resulting in injury are not actionable. *Harris v. Byers*, 210 Ark. 695, 698, 197 S.W.2d 730 (1946) (citing *Bankers Utilities Co. v. Cotton Belt Savings & Trust*

*Co.,* 152 Ark. 135, 237 S.W. 707 (1922)). This has long been so. "[I]n equity as well as at law fraud and injury must concur to furnish ground for judicial action; a mere fraudulent intent unaccompanied by any injurious act is not the subject of judicial cognizance; and strong grounds for suspicion are not sufficient, for fraud ought not to be conceived, but it ought to be proved and expressly found." *Irons v. Reyburn,* 11 Ark. 385, 389 (1850).

██ ██ In short, had Davis brought his action for fraud prior to Tyson denying him hogs and announcing they were going out of the bedded-floor hog business in 1998, he would have suffered a dismissal under Ark. R. Civ. P. 12. He had no contract action because he received the contract Tyson represented they would provide and the contract he was expecting, a short-term contract. The facts of this case are unusual. In this case, the facts are in the reverse order that facts under fraud are often seen. Typically, a party in a fraud action is injured and is unaware of who harmed him. In that case, where there is concealment, the concealed fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence. *Seeco, Inc. v. Hales,* 341 Ark. 673, 22 S.W.3d 157 (2000); *Martin v. Arthur,* 339 Ark. 149, 3 S.W.3d 68 (1999). In all due respect to the dissent, concealment is simply not an issue in this case, and contrary to the dissent's assertion that Davis had a duty to file an action complaining of fraud within three years of signing the contract in October, 1995, Davis could not have filed a complaint for fraud until 1998 when he was told by Tyson there would be no more hogs without suffering a dismissal under Ark. R. Civ. P. 12.

Davis argued that Tyson made a false representation of a material fact through Johnson that the bedded-floor hog program was a long-term program, and that Tyson would be needing hog growers like Davis for the indefinite future. He also argued that Johnson knew this representation was false because Tyson intended to send all its feeder hogs to its units in Missouri as soon as they came on line. Davis further asserted this representation was made to induce him to enter into substantial debt and engage in the business of raising hogs on bedded floors at a time Tyson desperately needed growers short term even though Johnson knew Davis could never make his investment back in the time hogs would be available. Davis finally argued that his reliance on the representations of a Tyson's regional manager was justifiable reliance and that he suffered damage as a consequence of the misrepresentation.

 As discussed in the facts above, evidence of these elements was put on by Davis. The jury was then instructed on the five elements of fraud and asked to determine whether the five elements were met. The jury was also instructed on promissory estoppel. The jury found for Davis on a general verdict. The verdict in this case was a decision on the whole case or, in other words, indivisible. *J. E. Merit Construction Inc., supra.* We are left without recourse to determine whether the jury found liability on fraud, promissory estoppel, negligence, or on all of the theories. We will not question nor theorize about the jury's findings. *Esry, supra.* This court in *State v. Cherry*, 341 Ark. 924, 20 S.W.3d 354 (2000) cited *Watkins v. Taylor Seed Farms, Inc.*, 295 Ark. 291, 748 S.W.2d 143 (1988) for the proposition that the sanctity of jury deliberations is a fundamental precept of our adversary system, and cited *Borden v. St. Louis Southwestern Ry. Co.*, 287 Ark. 316, 698 S.W.2d 795 (1985) for the proposition that this court has shown a reluctance to invade the sanctity of the jury room in order to impeach a jury's verdict. We also note the testimony in this case was not consistent. We have long held that we do not pass upon the weight and the credibility of the evidence, as such determinations remain within the province of the jury. *Fayetteville Diagnostic Clinic v. Turner*, 344 Ark. 490, 42 S.W.3d 420 (2001).

The issues, including fraud, were put before the jury, and the jury found for Davis. That verdict may not be reached. The jury apparently believed the evidence put on by Davis rather than that put on by Tyson.

### Statute of Limitations

 Tyson asserts that the claims based on fraud and promissory estoppel were barred by the statute of limitations and that the trial court was in error in denying their motion for a directed verdict. The applicable statute of limitations on fraud and deceit is three years. *Hampton v. Taylor*, 318 Ark. 771, 887 S.W.2d 535 (1994); Ark. Code Ann. § 16-56-105 (1987). Tyson argued that the last date on which Davis might reasonably argue he knew he had been lied to was in October 1995 when he signed a one-year contract on the new farm. By this act, Tyson argues, Davis had to know there was a problem because the contract did not reflect a long-term obligation to provide hogs. As already noted, however, Davis testified he expected short-term contracts. Davis argues he did not know of the fraud until Tyson declined to provide more hogs in 1998. He also argues that he last confirmed with Tyson

through Hudson in late 1996 that the bedded-floor program was there for the long term. The jury was asked to decide whether Davis could justifiably rely on these representations and apparently found he could. The complaint was filed February 24, 1999. These events all occurred within three years of the filing of this lawsuit. There is no merit to the statute of limitations claim.

### Waiver

■ Tyson argues that Davis waived any claim for fraud or implied contract by signing and performing under new contracts after Davis admitted he knew there was no long-term contractual obligation to provide him with hogs. Professor Farnsworth has defined waiver as a term of art in the law of contracts as follows:

> The meaning of waiver has provoked much discussion. Although it has often been said that a waiver is "the intentional relinquishment of a known right," this is a misleading definition. What is involved is not the relinquishment of a right and the termination of the reciprocal duty but the excuse of the nonoccurrence of or a delay in the occurrence of a condition of a duty.

E. Allan Farnsworth, *Farnsworth on Contracts* § 8.5 at 540-541 (3rd ed. 1999) (footnotes omitted).

■ As discussed above, Davis has not asserted a contractual obligation to provide him with hogs long term. Davis testified he received the contracts Tyson represented would be provided, and that because the bedded-floor program was being run as the poultry business was run, he did not expect a long-term contract. Thus, there is no waiver under contract. Nor is there waiver by this conduct otherwise. Davis's execution and performance under the short-term contracts does not show he had knowledge of the misrepresentation or, in other words, that he knew Tyson intended to cut off the bedded-floor program once the Missouri finishing units were ready. There is no merit to the claim of waiver.

### Reasonable Reliance/Substantial Evidence

■ Tyson argues that the trial court erred in denying its motion of a directed verdict on a lack of substantial evidence and particularly on a lack of evidence of reasonable reliance. Justifiable reliance is an element of fraud. Our standard of review of the denial

of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Eythl Corporation v. Johnson*, 345 Ark. 476, 49 S.W.3d 644 (2001).

The witnesses in this case contradicted each other on what was said and what representations were made. There was testimony by at least three witnesses that Johnson made the representations Davis asserts. At the time, Johnson was a regional manager for Tyson. Thereafter, he received a promotion. He thus held a position of significant authority with Tyson throughout the relevant years. Additionally, Davis testified that Tyson employee Hudson made substantial representations to him affirming Tyson's intent to remain in the bedded-floor business long term. Hudson denied making such representations. There were the disputed contracts that were in evidence as well as numerous other documents. Johnson and other Tyson employees testified at length refuting the claims of Davis.

█ However, although conflicting, there was substantial testimony and other evidence in this case that was sufficient to compel a conclusion one way or the other. This case was properly submitted to the jury to decide the issues including whether there was justifiable reliance. A strong argument is made that the collective rumors and information Davis knew of indicating the program was short term ought to have put him on notice and were sufficient to find he did not justifiably rely on the representations of regional manager Johnson. However, as noted, there is substantial evidence that was submitted to the jury. To decide this case on the issue of notice under these facts would require us to weigh the credibility of the witnesses, which we will not do. *Fayetteville Diagnostic Clinic, supra.*

### Damages

Tyson brought a motion for a directed verdict arguing the evidence submitted on damages was fatally flawed in that a lost-profits analysis was improper, and that instead the measure of damages should have been under a reliance analysis, in other words, what Davis bought minus what he received. Tyson also asserts the jury was incorrectly instructed on damages.

█ The expert testimony by both sides was on loss of profits, but which also included losses associated with equipment, land purchase, and sale. In *Interstate Freeway Serv., Inc. v. Houser*, 310 Ark.

302, 308, 835 S.W.2d 872 (1992), this court stated as to damages in fraud:

> Two measures of general damages are generally applied in actions for fraud in recognition of the underlying elements of both tort and contract in those actions. The first measure is the benefit of the bargain measure, in which the injured party is entitled to the difference between the value of the property, business, or chattel as represented and its actual value at the time of the purchase. In essence, the injured party would receive his expectation. The second measure is the out-of-pocket measure, in which the injured party is to be made whole by being restored to the position he was in prior to the injury; this measure provides for the difference between the purchase price and the actual value of the goods received. H. Brill, *Arkansas Law of Damages*, 35-37 (1990).

The damages asserted by Davis were based upon the alleged false representations that Tyson would be in the bedded-floor hog business long term and that Tyson encouraged Davis to enter into the business to Tyson's advantage and then to expand the business in 1995 when Tyson knew it would not provide hogs long enough to support such an investment. Relying on these representations, Davis alleges he acquired the debt and made the expenditures necessary to meet Tyson's requirements to raise hogs on a bedded floor anticipating he would raise hogs indefinitely. Johnson testified the equipment Tyson required had a ten-year life span. It appears Davis's expert based his calculations on ten years. Tyson's expert based his calculations on four years based on Davis's retirement age. The total figure of damages proposed by the two experts were radically different, with Tyson alleging damages of about $100,000 if liability were found and Davis's expert alleging damages of about $1.1 million dollars.

The standard of review is whether there is substantial evidence. *Eythl Corporation, supra.* Although the expert testimony varies greatly, both sides were analyzing loss of profits as well as losses due to purchase and sale of real property and equipment. Both parties appeared to argue what they believed the total economic loss was. There was sufficient evidence. The evidence was presented to the jury, and the general verdict casts no light on what decision the jury reached other than liability and an amount of damages. No further analysis may be undertaken. Special interrogatories concerning damages were not requested. We are left in the position of not knowing the basis for the jury's verdict, and we will not question nor theorize about the jury's findings. *Esry, supra.*

■■■■■ We finally note Tyson complains of refusal of a jury instruction. In the course of discussing jury instructions, Tyson proposed a special jury instruction that defined lost profit and provided instruction on how it was to be calculated. The trial court found the existing instruction sufficient. The abstracted record shows Tyson made no objection. The failure to object to the jury instruction given constitutes a waiver. *Delta School of Commerce, Inc. v. Wood*, 298 Ark. 195, 766 S.W.2d 424 (1989). We also note that when instructions are requested which do not conform to AMI, they should be given only when the trial judge finds the AMI instructions do not contain an essential instruction or do not accurately state the law applicable to the case. *Precision Steel Warehouse v. Anderson-Martin*, 313 Ark. 258, 854 S.W.2d 321 (1993); *Newman v. Crawford Constr. Co.*, 303 Ark. 641, 799 S.W.2d 531 (1990). The model AMI instructions are to be used as a rule and non-AMI instructions should only be used "when an AMI instruction cannot be modified." *Parker v. Holder*, 315 Ark. 307, 311, 867 S.W.2d 436 (1993). Here the issue of modification of the AMI instruction was not raised. Rather, Tyson simply provided a special instruction that was rejected. There is no merit to the alleged error.

Affirmed.

IMBER, J., not participating.

GLAZE and THORNTON, JJ., dissent.

R AY THORNTON, Justice, dissenting. Today's decision by the majority court allows recovery for the breach of an oral promise allegedly made in 1994, more than five years before this litigation was filed and nearly four years after Davis signed a written contract for a one-year agreement that specifically stated, "This contract supersedes prior agreements between the parties hereto whether oral or written."

Davis admits that he had knowledge that the October 19, 1995 contract did not provide for a long-term commitment, which he contended had been fraudulently promised by Tyson. However, he chose to disregard the express language of the October, 1995 agreement and to rely on the oral agreement that he believed he had made with Tyson's employee, Tom Johnson. He testified:

> Yes that's the contract I signed on October 19, 1995. Yes this is another three grow-out one year contract. Yes I'll agree there's no language in here that says Tyson is obligated to place anymore pigs

> with me after the end of the three grow-outs that's talked about in here. . . . I saw it, the contract that I signed before I borrowed the money. Yes I saw it and signed it. I knew I had a three batch deal when I signed the contract that's what our agreement says when I signed the note. That's [what] the contract said, but the verbal agreement, too, I had with Tom Johnson was the one I went by.

The majority reasons that the recovery was correctly allowed because the matter is not governed by principles of contract law, but because the jury found that an act of fraud occurred in a fraudulent representation by Johnson that a series of one-year contracts would continue for twenty years "or until death do us part." Based upon this allegedly false promise made in 1994, Davis borrowed a substantial sum of money from the bank and modified his turkey houses to raise pigs. After completing these modifications, he entered into an initial one-year contract that he did not read, and commenced pig operations. During this contract year, Davis was told by Tyson that the arrangement was short-term.

However, the majority reasons that our three-year statute of limitations for allegations of fraud and promissory estoppel did not commence running when a Tyson employee specifically advised Davis that there was no long-term agreement. This encounter with Tyson caused Davis to believe that Tom Johnson "had lied" about the long-term nature of the promise of a lifetime supply of hogs. Davis testified that in May, 1995, he was given notice that the promise of a long-term commitment was false. He testified:

> Yes I overheard one of the Tyson guys say that the dry bed farms were going to be a short term deal. . . . I couldn't believe what I was hearing so I confronted this guy and said I was told it was a long term deal. That's what he was referring to he looked me in the eye and said well it's a short term deal just until we get something else going somewhere else. The next thing I did was call Tom Johnson. I called Tom Johnson cause I thought Tom had lied to me and I wanted to confront him. That's right Tom Johnson said nothing has changed . . . [.]

Not only was Davis told in May, 1995 that there was no long-term deal, he read and signed a written contract on October 19, 1995 expressing clearly that there was no long-term commitment. As previously stated, this contract was for three grow-out periods, aggregating approximately one year. The written contract specifically stated that it superseded prior agreements between the parties

"whether oral or written." Davis stated that he read and understood this contract, but relied on his verbal agreement with Johnson.

Until this case, the law in Arkansas has been clear. The statute of limitations for an action based on fraud is three years. Ark. Code Ann. § 16-56-105 (1987); *Hampton v. Taylor*, 318 Ark. 771, 887 S.W.2d 535 (1994). The limitation period begins to run, in the absence of concealment of the wrong, when the wrong occurs, not when it is discovered. *Hampton, supra.* Accordingly, the running of the statute of limitations commenced when Johnson made the oral promise that Davis could have hogs as long as he lived, but was tolled during the time Davis had not discovered that it was false.

The running of the statute of limitations was suspended only until Davis discovered fraud or "should have discovered it by the exercise of reasonable diligence." *Talbot v. Jansen*, 294 Ark. 537, 744 S.W.2d 723 (1998). A concealed fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence. *SEECO v. Hales*, 341 Ark. 972, 22 S.W.3d 157 (2000). No mere ignorance on the part of the plaintiff of his rights, nor the mere silence of one who is under no obligation to speak, will prevent the statute bar. *Chalmers v. Toyota Motor Sales, USA, Inc.*, 326 Ark. 895, 935 S.W.2d 258 (1996). There must be some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed or perpetrated in such a way that it conceals itself. *Id.* If the plaintiff, by reasonable diligence, might have detected the fraud he is presumed to have had reasonable knowledge of it. *Id.*; *Smothers v. Clouette*, 326 Ark. 1017, 934 S.W.2d 923 (1996).

In the circumstances of this case, it is clear that Tyson did not conceal from Davis that the arrangement was short-term, but in fact specifically advised him that it was short-term, and then prepared and executed with Davis a short-term agreement. It is difficult to imagine a more open and complete disclosure that the arrangement was short-term in nature and that any representation that there was a long-term commitment was false. Upon his learning that the representation of long-term commitments was false, the statute of limitations commenced running, and Davis had the duty to file an action complaining of fraud within three years of his discovery of the misrepresentation. In fact, the evidence indicates that Davis considered filing such a complaint in 1996. Davis had suffered damages by borrowing money from the bank and in improving his

turkey houses to accept pigs in reliance upon a false long-term commitment. There was no evidence of any further act so furtively planned and secretly executed as to keep Davis's cause of action concealed. *See Chalmers, supra.*

Davis's own testimony shows that he knew or should have known at the time of his signature on the October 19th contract that the promise of a long-term agreement was false. Davis admits to understanding that the October, 1995 agreement did not contain the long-term commitment he claimed he had been promised. Upon his discovery that Johnson's promise was false, he knew of the fraud, and the limitations statute commenced running at or before October 19, 1995. The statute barred the filing of a complaint after more than three additional years had lapsed.

Once alerted to the false representation of the long-term agreement, and thereafter signing a one-year agreement extinguishing all oral agreements, it cannot be disputed that Davis had full knowledge that any cause of action that he had for fraud could have been filed at any time. In my view, the three-year statute of limitations for fraud and promissory estoppel commenced running when Tyson's employee advised Davis that there was no long-term commitment. Davis formally acknowledged this repudiation of any long-term commitment when he signed the written contract for one year in October of 1995, and testified that it did not contain his alleged long-term agreement. Nearly four years elapsed after he signed this contract, and before he filed this action. Clearly the statute of limitation had run.

However, the majority contends that an element of fraud, the injurious act, did not occur until 1998. I disagree. The majority is correct in stating that the tort of fraud consists of five elements that the plaintiff must prove by a preponderance of the evidence: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Golden Tee, Inc. v. Venture Golf Schools, Inc.,* 333 Ark. 253, 969 S.W.2d 625 (1998).

Here, Davis presented evidence that Tom Johnson's statement that Davis could have hogs "until death do us part" was false, satisfying the first element. Certainly, the second prong that there was insufficient evidence upon which to make such a representation

was shown. The third element, an intent to induce action in reliance upon the representations, was demonstrated when Davis's contracted with Tyson for the production of hogs, thereby satisfying the fourth element of justifiable reliance on Johnson's representations.

The fifth element requires a showing that Davis suffered damages as a result of his reliance upon Tyson's representation. It is clear that Davis suffered injury when he borrowed money from the bank to modify and improve his turkey houses so they could be used to grow hogs. As stated in the majority opinion, Davis contends that he was misled and enticed to enter into significant debt and investment to Tyson's benefit based upon Tyson's false representations. The five elements necessary to constitute an act of fraud were present when he borrowed money and invested in equipment needed to grow hogs. The act of fraud was complete at that point in time.

Subsequently, Davis was specifically told in May of 1995 that there were no long-term commitments by Tyson. Recognizing that he had been injured, Davis considered filing an action for fraud at that time. Reece Hudson testified, "Yes at that point some time after Mr. Johnson left[,] Mr. Davis threatened to sue. I don't know what — No this was in the latter part of 1996 this is not something that Mr. Davis just dreamed up for this lawsuit filed in '99." Contrary to the majority's observation in *obiter dictum*, I believe that such an action would not have been dismissed.

The majority next suggests that the statute was further tolled because of a colloquy in 1996. I believe that the statute had commenced running not later than October 19, 1995, and the majority cites no authority for the proposition that after the discovery of a fraud starting the running of the statute in October 1995, the running of the statute could be further tolled by an oral repetition of the promise that Davis had already discovered to be false.

Neither was any argument advanced by Davis that a new fraud was committed. According to Davis's testimony, there was a renewed assurance in 1996 that Tyson was going to stay in the hog business, using bedded floors, for a long time. Davis testified as follows:

> Q. Okay. What did Reece Hudson [Tyson employee] tell you that Moeller said about bedded floors in 1996?

A. Well one day we were just having a conversation and he said he had spent all day with Bill Moeller riding around looking at hog houses and bedded floors and that Bill said that they were doing good and that they was gonna be around for years to come.

Q. How did that make you feel?

A. Made me feel pretty good.

It is worth noting that Davis was not privy to this alleged conversation between two Tyson employees. Reece Hudson, the Tyson employee quoted by Davis, testified to the contrary. He stated:

I guess when I started going out there at the end of the batches, not before then but when I started going out there at the end of the batches, yeah, Mr. Davis and me had talked about his contract. . . . *I would go out there and he would always say, "Well he had a promise, pigs forever," and I would always [say,] "Well, Mr. Davis, I never heard that, I always heard a certain length of time on your contract"*; and he'd say, "Well, I wasn't there" and I'd say, "OK" and he would say specifically that Tom was the one. Tom Johnson.

* * *

*Yes I did use those words [that the program was temporary] with Mr. Davis. I would say, you know, this is a temporary deal. (R. 1340) Yes. I kept notes.* I didn't record everything that was said and I didn't record maybe every time I went out there; but I did keep notes.

(Emphasis added.)

The majority gives great weight to Tyson's general statement that they were going to remain in a bedded-floor hog business for a long time. The majority then concludes that the statute did not start running until 1998 when Tyson did not sign a new contract and stopped shipping hogs. In my view, the majority is simply wrong in failing to recognize that our three-year statute of limitations had run, and that Tyson's motion to dismiss as to the elements of fraud and promissory estoppel should have been granted.

I am authorized to state that Justice GLAZE joins in this dissent.