# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3349

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Thomas James Hively, also | * |
| known as T.J. Hively, | * |
| | * |
| Appellant. | * |

_____

No. 04-3352

_____

Appeals from the United States
District Court for the Eastern
District of Arkansas.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Wesley John Ketz, | * |
| | * |
| Appellant. | * |

_____

Submitted: October 10, 2005
Filed: February 10, 2006

_____

Before ARNOLD, BOWMAN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Thomas James "T.J." Hively, the elected prosecuting attorney for the Sixteenth Judicial District of Arkansas, and his law partner and deputy prosecuting attorney Wesley John Ketz were convicted of mail fraud and racketeering after a jury trial. They appeal, both arguing that there was insufficient evidence of their guilt. Hively also contends that the district court[1] erred in not holding an evidentiary hearing on his claim of double jeopardy and in its forfeiture order. Ketz makes two additional claims of error by the district court: rejoining his case to Hively's and excusing a juror during deliberations without seating an alternate. We affirm.

I.

In 2000 Hively, Ketz, and bail bondsman Gary Wayne Edwards were indicted on sixty four counts charging crimes related to the prosecuting attorney's office, which Hively held from 1993 until 1998. Count 1 alleged a pattern of racketeering activity in violation of 18 U.S.C. § 1951 (RICO); fourteen of the alleged predicate acts were connected to two schemes to obtain federal and state grant money for special legal work related to drug and child support enforcement. Under the grant programs the individual prosecutors who did the work were to receive the supplemental funds furnished to the office. Hively himself was not eligible for any grant money, but he nevertheless arranged to receive some $429,391.47 of the funds between 1995 and 1998. These two grant funding schemes were also the basis for the mail fraud and money laundering charges in Counts 2 - 34 of the indictment.

The first program grant came from the United States Department of Justice and was administered by the Arkansas Office of Intergovernmental Services. It was intended to pay a part time deputy prosecutor to process drug cases for the Sixteenth

---

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

Drug Task Force (DTF). As an elected prosecuting attorney, Hively was disqualified from receiving DTF grant money, but he appointed Ketz as his deputy and represented through several grant applications and subgrant award letters mailed to the state that Ketz was primarily responsible for the DTF cases. Although Hively prosecuted all the felony drug cases, reviewed all related search warrants, and generally handled most of the important legal issues related to drug enforcement, it was Ketz who signed his name to the monthly contractor reports detailing the DTF work. Ketz then received monthly checks from the state which he would first deposit in his professional account and subsequently write Hively a check for the same amount. The government's evidence indicated that Ketz funneled approximately $88,361 in DTF grant money to Hively in this way. When Ketz learned in November 1997 that a search warrant had been executed on their law firm, he attempted to refund to the state the last amount he had received and passed on to Hively. The DTF program was also the basis for Counts 14 and 15 which charged Hively and Ketz with mail fraud, in violation of 18 U.S.C. § 1341, and Counts 16 - 34 which alleged twenty acts of money laundering, in violation of 18 U.S.C. § 1956(c)(4)(B).

The second grant program involved the Sixteenth Child Support Enforcement Unit (CSEU) which was funded under a cooperative agreement with the Arkansas Office of Child Support Enforcement. Under this program the state agreed to reimburse the prosecuting attorney's office for legal child support enforcement work. As with the DTF grant money, the office was to pass the funds directly on to the attorney working on the cases. Hively appointed Vickie Warner, an associate in his and Ketz's law practice, as the deputy prosecuting attorney in charge of CSEU matters. Although it was Warner who did virtually all of the CSEU legal work, Hively put his own name or that of the firm on the reimbursement forms mailed to the state, and he kept almost all of the money. There was evidence that most CSEU matters involved relatively little legal work and that administrative work could not be reimbursed, and the indictment also alleged that Hively pocketed funds for work that was never done or that he knew was not covered by the agreement. There was evidence that he took approximately $332,000 in supplemental CSEU funds between 1995 and 1998.

Counts 2 - 13 of the indictment alleged eleven acts of mail fraud by Hively involving reimbursement forms submitted as part of the CSEU scheme.

Some of the other RICO predicate acts charged against Hively and Ketz alleged mail fraud involving a payback from the salary of another deputy prosecuting attorney, David Miller, a scheme that was also the basis for mail fraud Counts 35 - 62. The remaining predicate acts involved three separate attempts at extortion by Hively and Edwards who allegedly conspired to extort real property from John Milton Northrup, a man charged with molestation, and from Kathy Sampson Clark, whose husband was charged with murder, as well as approximately $3000 from Troy Gibson, who had been charged with drunk driving. The extortion allegations in respect to Northrup and Clark were also the basis for Counts 63 and 64 of the indictment which charged Hively and Edwards with conspiring to affect interstate commerce through extortion, in violation of 18 U.S.C. § 1951(a).

The case was initially assigned to the Honorable James M. Moody. All three defendants moved for severance, and the motions of Ketz and Edwards were granted on the grounds that a joint trial could prejudice them since there were more charges and evidence against Hively and because Hively and Ketz had a close association as law partners. Judge Moody subsequently decided to try Hively's case first. At the close of the government's evidence, Hively successfully moved for acquittal on the grounds of insufficient evidence on Count 13 (CSEU mail fraud) and Counts 35 - 62 (Miller salary mail fraud). At the close of the defense case, Judge Moody also dismissed Counts 16 - 34 (DTF money laundering). This left only Count 1 (RICO), Counts 2 - 12 (CSEU mail fraud), Counts 14 and 15 (DTF mail fraud), and Counts 63 and 64 (conspiring to extort real property) for submission to the jury. The jury was unable to reach a verdict on any of the counts after approximately three days of deliberations, and the court declared a mistrial on March 15, 2002. Hively then moved for a judgment of acquittal on all remaining counts, and the court took the motion under advisement.

-4-

Some six weeks later on May 2, 2002, counsel were informed that a signed order on Hively's motion for acquittal would be available at the clerk's office the next day. Without the order having been filed or either side knowing its contents, the United States Attorney for the Eastern District of Arkansas sent Judge Moody a letter bringing a potential conflict to his attention. The letter pointed out that before going on the bench in 1995, the judge had defended Hively in a malpractice action brought in March 1992 by a brother of defendant Edwards. Judge Moody immediately recused himself from the severed cases which were then reassigned to the late Judge Stephen Reasoner. After Judge Reasoner had to withdraw because of illness, they were reassigned to Judge George Howard, Jr.

II.

After the case was transferred to Judge Howard, the government moved to rejoin the charges against Ketz and Edwards with the sixteen counts remaining against Hively. Judge Howard found that the circumstances had changed significantly since the original severance decision. Most of the charges in the original indictment had been dismissed by the former presiding judge, and the only remaining charges against Ketz were racketeering and DTF mail fraud. The court concluded that at this point separate trials were not needed, and it granted the rejoinder motion. Hively moved for an evidentiary hearing to disclose the contents of Judge Moody's unfiled order and to dismiss on double jeopardy grounds if he had decided to grant the motion for acquittal. Judge Howard denied the motion for an evidentiary hearing; Hively attempted two interlocutory appeals, both of which were summarily dismissed by this court. See United States v. Hively, No. 02-2292 (8th Cir. July 2, 2002) (order dismissing interlocutory appeal), cert. denied, 537 U.S. 1073 (2002); United States. v. Hively, No. 03-3022 (8th Cir. Oct. 1, 2003) (order dismissing interlocutory appeal).

The case proceeded to a joint trial on the remaining charges against all these defendants. The trial lasted from February 2 to March 5, 2004. The government called thirty five witnesses and offered several hundred exhibits. Both Hively and

Edwards testified, and the defendants called four other witnesses and offered over one hundred exhibits. The government witnesses included members of Hively's office staff who were familiar with the workings of both the DTF and CSEU grant programs, government officials who had dealt with Hively and Ketz in relation to both programs, and victims of the extortion attempts by Hively and Edwards. Exhibits included copies of the grant applications, subgrant award letters, and reimbursement forms used to perpetrate the DTF and CSEU schemes; records of cash transfers between Ketz and Hively; and lewd images of Northrup used by Hively and Edwards in their extortion attempt.

After the jury had been deliberating for about a day and a half, one of the jurors informed the court that her husband had experienced a mental breakdown in Massachusetts which would require hospitalization and that she would have to leave. The district court held a hearing in chambers before deciding to excuse her and to proceed with the eleven remaining jurors. The district court reasoned that the jury might have already reached a decision on some of the charges and that the introduction of a thirteenth juror could prove problematic. No objection was recorded to the court's procedure or to its decision to excuse the juror, but counsel for Ketz did object to the failure to seat an alternate.

The jury eventually deadlocked on eleven of the remaining counts, including all the charges against Edwards, but it reached a verdict on five counts. Hively was convicted of mail fraud on Counts 11, 12, 14, and 15 (for offenses in March 1998, May 1998, July 1996, and April 1997 respectively), Ketz was convicted for aiding and abetting on Counts 14 and 15, and both men were convicted of racketeering on Count 1. The district court imposed concurrent five year sentences on Hively for each count with two years suspended and three years of supervised release. It also ordered Hively to forfeit as RICO proceeds the entire $429,391.47 he had received from the CSEU and DTF grants. Although Hively had not requested that the amount of RICO forfeiture be determined by the jury, he moved to vacate the forfeiture order almost four months after it was entered but never obtained a ruling on the motion. Ketz was

sentenced on each count to concurrent five year terms with three years suspended and three years of supervised release.

These appeals followed. Hively challenges the sufficiency of the evidence, argues that he was entitled to an evidentiary hearing on his double jeopardy claim, and attacks the validity of the forfeiture order. Ketz also challenges the sufficiency of the evidence and contends that the district court erred in rejoining his case to Hively's and in failing to seat an alternate for the juror excused during deliberations.

## III.

## A.

Hively contends that there was insufficient evidence to convict him of either mail fraud or racketeering. We review de novo the district court's denial of a motion for a judgment of acquittal. United States v. Howard, 394 F.3d 582, 585 (8th Cir. 2005). In assessing whether the evidence was sufficient to convict, we view the record in a light most favorable to the government when it prevailed before the jury. United States v. Ramirez, 350 F.3d 780, 783 (8th Cir. 2003).

As to his mail fraud convictions, Hively first contends that the two counts connected to the DTF scheme were based almost entirely on the testimony of David Wilkerson, an official who administered the state program and who testified that Hively actually did much of the work attributed to Ketz. Since Wilkerson did not have regular contact with any of the defendants, Hively argues that his testimony was outweighed by other evidence. As examples he points to the testimony of Jerry Duran, an official who said that the state "got fair bang for their buck," and of Agent Mike Lowe, who testified that Ketz handled "most of the municipal and everyday legal affairs" of the task force. The government counters that there was ample evidence to convict Hively on the DTF mail fraud counts because the issue there was whether Ketz had done enough significant work to justify the false impression

conveyed to state officials that he had primary responsibility for many DTF matters. According to the government, it showed at trial that Hively had done most of the important work while seeking to convey the impression that it was being done by Ketz. Hively also argues that the evidence did not show that the mails had been used since the DTF grant applications were routinely hand delivered. The government responds by pointing out that the DTF mail fraud charges were based on the subgrant award letters mailed to Hively to be signed and returned. Wilkerson testified that these letters were in fact returned by mail, and it was up to the jury to decide whether or not to believe his testimony.

Hively finally contends with regard to his CSEU mail fraud convictions that the government did not prove intent to defraud and that he had done most of the work on nights and weekends when the witnesses who testified against him were not present. In response the government points to testimony by Warner and others in Hively's law office that very little legal work was actually required for most CSEU matters and that Hively was repeatedly informed by the state that he could not take money for work not personally performed. There was evidence that these warnings played a role in eventually causing Hively to abandon the CSEU contract, and the government asserts that proof of Hively's knowledge of the applicable rules and his acts in violation of them show his intent to defraud. See United States v. Parker, 364 F.3d 934, 940-42 (8th Cir. 2004) (evidence that defendant was aware he was violating governing regulations relevant to show motive and intent for mail fraud).

In order to establish mail fraud the government must prove that the defendant: 1) voluntarily and intentionally devised or participated in a scheme to defraud; 2) entered into the scheme with intent to defraud; 3) knew that it was reasonably foreseeable that the mails would be used; and 4) used the mails in furtherance of the scheme. United States v. Bearden, 265 F.3d 732, 736 (8th Cir. 2001). Although Hively disputes many issues of fact involving both grant schemes, the jury apparently did not find his trial testimony credible in light of the other evidence, which included records and testimony by his staff and Arkansas officials showing that he had been

primarily responsible for most DTF matters despite the representations that the work was being handled by Ketz. On factual determinations such as the credibility of witnesses the jury's verdict controls. See United States v. Little Dog, 398 F.3d 1032, 1036 (8th Cir. 2005).

To establish that the mails were used in connection with the DTF counts, the government had only to show mailings which were "incident to an essential part of the scheme or a step in the plot." United States v. Mooney, 401 F.3d 940, 946 (8th Cir. 2005) (internal quotations omitted). The jury could reasonably find from the evidence that the DTF subgrant award letters had been returned by mail in order to obtain payment, and Hively does not dispute that the mails were used in furtherance of the CSEU scheme. Taking the evidence in a light most favorable to the government as we must in light of the verdict, we conclude that there was sufficient basis for a reasonable jury to find beyond a reasonable doubt that Hively committed the four counts of mail fraud of which he was convicted.

Hively also challenges the sufficiency of the evidence underlying his RICO conviction, arguing that the government failed to prove that he engaged in a pattern of racketeering activity through which a criminal enterprise conducted its affairs. See United States v. Darden, 70 F.3d 1507, 1518 (8th Cir. 1995). In order to show a pattern of racketeering activity, the evidence must show continuity between the separate criminal acts predicate to a RICO violation. H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989). Continuity can be shown by related acts continuing over a period of time lasting at least one year (closed ended continuity), Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp., 986 F.2d 1208, 1215 (8th Cir. 1993), or by acts which by their very nature threaten repetition (open ended continuity). Northwestern Bell, 492 U.S. at 241.

Hively maintains that the government did not show either type of continuity and so failed to establish a pattern of racketeering activity. He contends there was no closed ended continuity because he was convicted of only two predicate acts of mail

fraud in relation to each grant program, these acts occurred within a year of each other, and the two grant schemes were not sufficiently related to be considered parts of the same enterprise for RICO purposes. The evidence also did not show open ended continuity he claims, for the transactions associated with each grant scheme were all completed when Hively left office so there was no threat of future illegal activity.

The government asserts that both forms of continuity were sufficiently shown to make out a pattern of racketeering activity. It argues that as to closed ended continuity, the two schemes were really different parts of one single overarching criminal enterprise centered on the prosecuting attorney's office and so the four predicate acts of mail fraud spanning more than a year can be considered together. As to open ended continuity, it argues that the DTF scheme would have continued into the future but for the search warrant executed against Hively's law firm.

Criminal acts are sufficiently related to be considered part of the same enterprise if they had the same or similar purposes, results, participants, victims or methods of commission, or if they were otherwise "interrelated by distinguishing characteristics" as opposed to being "isolated events." Id. at 240. We are satisfied here that the DTF and CSEU schemes were sufficiently related so that they could be considered parts of the same enterprise on the issue of closed ended continuity. They shared a common central participant (Hively), a common victim (Arkansas), a common purpose and results (Hively's enrichment), and common methods of commission (abuse of Hively's power as prosecuting attorney). We conclude that the jury could reasonably consider the predicate acts connected to each scheme as part of one single enterprise in determining whether or not Hively was guilty of racketeering.

Even if the predicate acts had not extended over a period of at least one year, there was also a sufficient threat of repetition in connection to the DTF scheme to show open ended continuity. At the time the search warrant was executed on his firm, Hively was still in office and still receiving DTF grant money from Ketz on a monthly

basis (he had deposited the most recent check the prior week). A reasonable jury could therefore have found that a "distinct threat of long-term racketeering activity" remained. Handeen v. Lemaire, 112 F.3d 1339, 1353 (8th Cir. 1997) (internal quotations omitted). Taking the evidence in a light most favorable to the government, we conclude that there was sufficient basis for the jury to find that Hively engaged in a pattern of racketeering activity.

## B.

Hively next argues that he had a colorable double jeopardy claim and should have received an evidentiary hearing on it before he went to trial before Judge Howard. He argues that Judge Moody had decided his motion for acquittal on the charges remaining from the first trial before his recusal and that the fact the order had not been filed is inconsequential because filing is merely a ministerial act. The government responds that an order for acquittal must be filed for entry of any judgment and that Judge Moody's order would have been a nullity in any event because he should have recused himself at the outset of the case. It also contends that Judge Howard would not have been required to conduct an evidentiary hearing even if Hively had made out a colorable double jeopardy claim.

The Fifth Amendment prevents criminal defendants from being "twice put in jeopardy" in connection with the same offense, a guarantee that encompasses a second prosecution for the same offense after either conviction or acquittal as well as the imposition of multiple punishments. United States v. DiFrancesco, 449 U.S. 117, 129 (1980). A double jeopardy claimant bears the initial burden to establish a non frivolous prima facie claim. United States v. Bennett, 44 F.3d 1364, 1368 (8th Cir. 1995). If a prima facie showing is made, a separate evidentiary hearing may be required, see, e.g., United States v. Benefield, 874 F.2d 1503, 1508 (11th Cir. 1989), but only if the relevant facts cannot otherwise be ascertained. See United States v. Curry, 328 F.3d 970, 974 (8th Cir. 2003). We review legal issues related to double jeopardy de novo. United States v. Okalie, 3 F.3d 287, 289 (8th Cir. 1993).

Hively cites no case law in support of his contention that the preparation of an unfiled and unpublished order on a motion for acquittal could establish a prima facie case of double jeopardy and that such an order could bar prosecution of the fifteen remaining counts against him. What he cites instead is a treatise distinguishing the "judicial act" of rendering judgment from the "ministerial act" of filing or entering an order in the official record: "the judgment itself is not that which may be entered or recorded, but that which is considered and delivered by the court." 46 Am. Jur. 2d, Judgments § 123 (1994). In the circumstances of this case we need not dwell on the difference between judicial and ministerial acts, for here no judgment was ever delivered by the court. Judge Moody recused himself before his order was released, thus ending his authority to act in the case. His draft order, whatever its contents, never took effect. We conclude that Hively raised no colorable double jeopardy claim and that the district court did not err by declining to hold an evidentiary hearing.

C.

Hively finally argues that the district court's forfeiture order was invalid because it was based on factual findings made by a judge rather than a jury in violation of United States v. Booker, 125 S.Ct. 738 (2005), Blakely v. Washington, 124 S.Ct. 2531 (2004), and Fed. R. Crim. P. 32.2. He also maintains that even if it were proper for the court to calculate the forfeiture amount, its figure was erroneous because it included the total proceeds from the CSEU and DTF schemes even though he had only been convicted of two predicate acts of mail fraud for each scheme and his legitimate expenses had not been deducted. The government responds that Hively waived this issue by failing to request a jury determination of the forfeiture amount, by waiting four months after the order was entered to object to the amount found by the court, and by never obtaining a ruling on his motion to vacate the order. It also argues that Booker and Blakely do not apply to criminal forfeitures and that the court's calculation of the forfeiture amount was correct under applicable law.

Title 18 of the United State Code, § 1963, provides for the forfeiture of all RICO proceeds. Although criminal forfeitures are no longer required by statute to be submitted to a jury, a party is entitled to a jury determination under Rule 32.2(b) if one is requested. Hively made no such request. Moreover, Hively did not object to the forfeiture order at the time it was issued by the district court and never sought a ruling on his eventual motion to vacate it. See United States v. Olson, 22 F.3d 783, 785-86 (8th Cir. 1994) (post trial objections to jury instructions on forfeiture insufficient to avoid waiver on appeal); United States v. Wagoner, 713 F.2d 1371, 1374 (8th Cir. 1983) (failure to obtain ruling on motion precludes appellate review). We conclude that Hively waived his right to challenge the forfeiture order on appeal and thus review for plain error.

Since Booker specifically referred to the forfeiture provision of the Sentencing Reform Act, 18 U.S.C. § 3554, which incorporates the relevant provisions of § 1963, as "perfectly valid," 125 S.Ct. at 764, we conclude that the district court did not err by calculating the forfeiture amount. Nor was the amount the court calculated erroneous. RICO proceeds are defined as the "gross receipts of the illegal activity," precluding any deduction for expenses. United States v. Simmons, 154 F.3d 765, 769-70 (8th Cir. 1998). We have previously rejected the contention that a RICO forfeiture must be based only on the particular predicate acts for which the defendant was convicted. See id. at 769 (RICO codefendants jointly and severally liable for entire proceeds of RICO enterprise regardless of whether they were involved in every part). Hively has not shown the district court plainly erred in its forfeiture order.

IV.

A.

Ketz also challenges the sufficiency of the evidence. He argues that the government failed to demonstrate that he had the requisite criminal intent to aid and abet mail fraud because he had been "instructed by his boss to report all (DTF related)

felony prosecutions," he never asserted that he personally handled all of the work, and it was not his fault that Hively used him as part of a broader scheme to mislead. The government counters that Ketz's bad faith was evidenced by his willingness to sign various reports giving the false impression that he was working on cases which were actually being handled by Hively, his making out checks to Hively for the amount of grant funds he received, and his subsequent attempt to return DTF funds to the state upon learning that a search warrant had been executed at their law firm.

The government was not required to show that Ketz personally made a misrepresentation in order to prove his intent to aid and abet mail fraud so long as it could prove the existence of an overall scheme in which he knowingly participated. See United States v. Whitehead, 176 F.3d 1030, 1038 (8th Cir. 1999) (existence of fraudulent scheme itself serves as evidence of intent to defraud). The issue of whether Ketz knowingly participated in the DTF scheme is a question of fact which is the province of the jury. See Ramirez, 350 F.3d at 783.

Ketz also argues that the misrepresentations in which he was implicated were not material. His agreement with Hively was nothing more than a "private adjustment" through which Ketz contracted out some of his responsibilities as deputy prosecuting attorney to his law partner. There was no pecuniary harm he claims since the work paid for was actually done, in contrast to cases like Bearden. See 265 F.3d at 732. In response the government contends that it did not have to prove actual harm so long as it could show that the misrepresentation caused the state to make a different decision than it otherwise would have made.

To prove mail fraud the government must show that material misrepresentations were sent through the mail. Neder v. United States, 527 U.S. 1, 23-24 (1999). A misrepresentation is material if it is capable of influencing the intended victim, see id. at 24, whether or not the overall scheme or plan to defraud led to any loss of money or property. Whitehead, 176 F.3d at 1037. According to the trial testimony of state officials, Hively was not eligible to receive DTF program money under any

-14-

circumstances, regardless of whether the work was done. The jury could reasonably find that the arrangement by which Ketz helped represent that he was doing the work and then forwarded the DTF funds to Hively involved material misrepresentations.

Ketz also challenges his RICO conviction on the grounds that the government has not shown he engaged in a pattern of racketeering activity. The government responds that Ketz was a participant in an overarching fraudulent enterprise that lasted for more than one year and that the nature of Ketz's participation in the DTF scheme was such that it would have continued into the future had it not been stopped by the execution of a search warrant on his law firm.

To prove a pattern of racketeering activity, the government must show either closed or open ended continuity. Northwestern Bell, 492 U.S. at 241. The former requires a series of related predicate acts extending over at least one year, Primary Care Investors, 986 F.2d at 1215, while the latter requires predicate acts that carry a "distinct threat of long-term racketeering activity" in the future. Handeen, 112 F.3d at 1353. The jury found that Ketz was an active participant in the DTF scheme which was itself part of a larger criminal enterprise centered on the prosecuting attorney's office and encompassing predicate acts that took place over more than a year. See United States v. Gonzalez, 921 F.2d 1530, 1545 n.23 (11th Cir. 1991) (RICO violation may be assessed on the basis of predicate acts committed by others). Moreover, Ketz was still participating in the DTF scheme when law enforcement officials executed a search warrant on his law firm and he appeared likely to continue but for that. The evidence was therefore sufficient to establish continuity and show that Ketz engaged in a pattern of racketeering activity.

B.

Ketz next complains that the district court erred in rejoining his case to those of Hively and Edwards. He argues that he was entitled to severance because there was a substantial likelihood of a prejudicial spillover effect from the greater amount of

evidence against Hively. Since he and Hively were law partners, he claims that it would have been difficult for the jury to compartmentalize the evidence, particularly given the nature of some of the extortion charges against Hively and Edwards. The government responds that Ketz's argument is not sufficient to counter the strong preference for trying codefendants together, particularly those engaged in joint activity, and that the jury was clearly able to compartmentalize the evidence against the defendants since it found Hively and Ketz guilty of different charges and deadlocked on Edwards.

Under Fed. R. Crim. P. 14(a) the issue of severance is entrusted to the "sound discretion of the trial judge." United States v. Knife, 592 F.2d 472, 480 (8th Cir. 1980). Where two or more defendants have been charged in the same indictment, there is a preference for a joint trial unless the benefits are outweighed by a clear likelihood of prejudice. Zafiro v. United States, 506 U.S. 534, 537 (1993). Prejudice can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a "prejudicial spillover effect." United States v. Mickelson, 378 F.3d 810, 817 (8th Cir. 2004); United States v. Lueth, 807 F.2d 719, 731 (8th Cir. 1986). The burden of showing a clear likelihood of prejudice falls on the party seeking severance. United States v. Frazier, 280 F.3d 835, 844 (8th Cir. 2002).

Trying codefendants together not only conserves scarce time and resources, but also "gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." Darden, 70 F.3d at 1528 (internal quotations omitted). Severance is never warranted simply because the evidence against one defendant is more damaging than that against another, United States v. Pecina, 956 F.2d 186, 188 (8th Cir. 1992), even if the likelihood of the latter's acquittal is thereby decreased. See United States v. Gravatt, 280 F.3d 1189, 1191 (8th Cir. 2002). What is required for a severance is a specific showing that a jury could not reasonably be expected to compartmentalize the evidence. Lueth, 807 F.2d at 731.

Ketz's claim of prejudice here is speculative and insufficient to overcome the presumption in favor of a joint trial. The fact that Hively and Ketz were partners in a law practice is not enough to show a clear likelihood of prejudice, particularly since they used their firm accounts to funnel much of the fraudulently obtained grant money. The two men were in fact closely associated in almost every aspect of their professional lives, an association that continued in their criminal activity, making a joint trial particularly appropriate. Although some of the extortion evidence which did not pertain to Ketz was of an unsavory nature, the court's instructions to the jury sufficiently distinguished the charges against each defendant to guard against any spillover effect of evidence applicable only to the other defendants. See Mickelson, 378 F.3d at 818 ("The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions."). Moreover, neither Hively nor Edwards, to whom the evidence applied, was convicted on the extortion charges. We conclude that the district court did not abuse its discretion by rejoining the defendants.

Ketz also argues that the earlier severance order was the law of the case. The government responds that that doctrine has no application here and that the original severance order could not be binding in any event because it was clearly erroneous. The law of the case doctrine stands for the proposition that once a court decides upon a rule of law, that decision is usually binding at subsequent stages of the same case. Arizona v. California, 460 U.S. 605, 618 (1983). The doctrine does not apply to interlocutory orders, however, for they can always be reconsidered and modified by a district court prior to entry of a final judgment. Murr Plumbing , Inc. v. Scherer Bros. Financial Services Co., 48 F.3d 1066, 1070 (8th Cir. 1995). The district court was free to reconsider the original severance order, especially in the changed circumstances after the dismissal of so many counts by the first trial judge.

C.

Ketz finally argues that the district court erred in excusing one of the jurors during deliberations. He contends that the court should have further investigated the

juror's request to be excused because of her husband's sudden health crisis in another state in order to determine that good cause existed. The government responds that Ketz waived this argument by failing to object below and that the court's decision was supported by good cause. Ketz admits that he failed to object at the time the juror was excused, but claims that his counsel had assumed that the departing juror would be replaced by an alternate and did object when the district court announced that no alternate would be seated. Since our study of the district court record indicates that neither Ketz nor his counsel objected to the court's decision to excuse the juror, we review that decision for plain error, Gonzalez, 339 F.3d at 728, but examine the question of whether an alternate should have been seated for abuse of discretion. See Frazier, 280 F.3d at 851.

After jury deliberations have begun, a trial court may excuse a juror only for good cause. Fed. R. Crim. P. 23(b). Good cause for excusing a juror has been found in many different fact situations, including a car accident involving a juror, see United States v. Armijo, 834 F.2d 132, 134 (8th Cir. 1987), and a medical emergency involving a family member. See Frazier, 280 F.3d at 850. Although an excused juror may be replaced during deliberations, Rule 23(b) also permits the use of an eleven person jury at the discretion of the trial court, particularly in the case of a protracted trial. See Fed. R. Crim. P. 23(b) advisory committee's note.

The juror excused here learned that her already physically unwell husband had experienced a severe mental breakdown in Boston which would likely require hospitalization, and she felt it was necessary to go to his side. The problem arose after a day and a half of jury deliberations following a four week trial. The case involved multiple counts for the jury to consider, and the district court worried that the original twelve jurors might have already decided factual issues. While it could have instructed the jury to start its deliberations anew after seating an alternate, the court was concerned that thirteen jurors could potentially be involved in deciding issues and

that this would undermine the validity of any verdict.  The procedure selected by the experienced trial judge was permitted by the rule and was not an abuse of his discretion.

## V.

Since we conclude that there was sufficient evidence underlying the convictions, that Hively has not made out a colorable claim of double jeopardy, that rejoinder of the cases was proper, that the failure to seat an alternate juror during deliberations was not an abuse of discretion, and that neither the district court's forfeiture order nor its decision to excuse the twelfth juror were plainly erroneous, we affirm the judgments of the district court.

_____