# United States Court of Appeals

## For the Eighth Circuit

———————————————

No. 14-1514

———————————————

The Stonebridge Collection, Inc.

*Plaintiff - Appellant*

v.

Keith Carmichael; Glenna Carmichael; Steven Massey; John Mark Taylor;
Cutting-Edge USA, LLC; Taylormade Unlimited, LLC

*Defendants - Appellees*

———————————————

No. 14-1601

———————————————

The Stonebridge Collection, Inc.

*Plaintiff - Appellee*

v.

Keith Carmichael; Glenna Carmichael; Steven Massey; John Mark Taylor;
Cutting-Edge USA, LLC; Taylormade Unlimited, LLC

*Defendants - Appellants*

—————————

Appeals from United States District Court
for the Western District of Arkansas - Hot Springs

—————————

Submitted: February 12, 2015
Filed: June 26, 2015

_____

Before RILEY, Chief Judge, LOKEN and SMITH, Circuit Judges.

_____

RILEY, Chief Judge.

The Stonebridge Collection, Inc., an engraver of promotional pocket knives, sued (1) former distributor Cutting-Edge USA, LLC and its members, Keith and Glenna Carmichael; (2) competitor knife engraver Taylormade Unlimited, LLC (TaylorMade) and its sole member and manager John Mark Taylor, a former Stonebridge employee; and (3) Steven Massey, a TaylorMade employee and former Stonebridge employee (collectively, defendants), on ten counts arising from Massey's copying Stonebridge's computer files. Relevant to this appeal, Stonebridge brought claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968; the Arkansas Deceptive Trade Practices Act (ADTPA), Ark. Code Ann. §§ 4-88-101 et seq.; and Arkansas common law. After a four-day bench trial, the district court[1] partially found for Stonebridge on its fraud and conversion claims, dismissed the remaining eight claims, and denied the parties' motions for attorney fees. Having appellate jurisdiction under 28 U.S.C. § 1291, we affirm in part and remand for further proceedings.

---

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

## I.    BACKGROUND

### A.    Facts

Stonebridge[2] engraves and sells personalized pocket knives, both directly to end-use customers and to distributors.  End-use customers who order directly from Stonebridge are referred to as "inside" customers—over 50% of Stonebridge's inside-customer orders are reorders.  End-use customers who order knives from a distributor like Cutting-Edge are "outside" customers.

From late 2004 through January 2011, Cutting-Edge distributed Stonebridge's engraved knives to outside customers, who paid Cutting-Edge directly.  From late 2004 through March 2010, Stonebridge provided Cutting-Edge free engraved knife samples.  Stonebridge delivered over 125,000 sample knives to Cutting-Edge and over 8,000 sample knives to Cutting-Edge's distributors.  Stonebridge delivered 6,476 of these sample knives after July 2009.

Once Cutting-Edge represented to Stonebridge it had received an order, Stonebridge provided Cutting-Edge free "proofs," which included the customer's logos and computer generated art depicting the customer's logo to be placed on the customer's knives.  Stonebridge sent to Cutting-Edge the proofs, contained on "proof selection forms," and "final proof pages," used for final proof approval and ordering.  Both the proof selection forms and the final proof pages generally included an order number, customer contact information, and, if applicable, a note indicating the order was a reorder.  Stonebridge also sent proof selection forms and final proof pages directly to inside customers.  Stonebridge created the art in Corel Draw (CDR) file format and converted it to Adobe PDF file format for customer approval.  Defendants claim Stonebridge's proof selection forms and final proof pages usually were sent to customers in PDF format and rarely in CDR format.

---

[2]Stonebridge's only shareholders are Mickey and Susan Gates.

From 2005 until he quit on July 23, 2009, Taylor was Stonebridge's general manager. Five days after quitting his job with Stonebridge, Taylor formed TaylorMade, a knife engraver. Around this time, the Carmichaels purchased two laser engraving machines for TaylorMade and loaned TaylorMade $25,000. Like Stonebridge's machines, TaylorMade's machines used computer generated art stored in CDR files. Around September 2009, Cutting-Edge started placing some of its engraved knife orders with TaylorMade. After that time, Cutting-Edge continued to place orders with Stonebridge, paying Stonebridge over $165,000. Cutting-Edge placed its last order with Stonebridge in January 2011.

From 2005 through September 14, 2009, Massey was Stonebridge's graphic artist, creating art for the engraving machines. Around September 9, 2009, unbeknownst to Stonebridge, Massey downloaded from Stonebridge's computer system, onto a flashdrive, (1) forms and templates; (2) more than 20,000 CDRs and PDFs with proof selection forms, final proof pages, and art for Cutting-Edge outside customers; and (3) more than 2,000 CDRs and PDFs with proof selection forms, final proof pages, and art for other customers, including inside customers.

By September 18, 2009, four days after Massey quit Stonebridge, Massey started working for TaylorMade. Massey uploaded the Stonebridge files from the flashdrive to his home computer and his TaylorMade work computer. TaylorMade and Cutting-Edge consulted these files to solicit Stonebridge customers. From November 2010 through March 2011, Massey sent Carmichael emails with attached images of Stonebridge proof pages for Stonebridge customers who were not yet Cutting-Edge's or TaylorMade's customers. TaylorMade modeled its proof selection, final proof approval, and ordering forms on Stonebridge's.

The parties stipulated neither Stonebridge's documents used to send proposed art to end-use customers nor its sales invoices were trademarked or copyrighted.

Stonebridge claims it had an unwritten policy—communicated to Taylor and Massey—that "no artwork, no files [were] ever to leave Stonebridge property." But Stonebridge admits it had no agreement with any defendant prohibiting them from using Stonebridge's art or forms.

Cutting-Edge's knife shipments for outside customers identified only Cutting-Edge as the shipper—Cutting Edge's customers did not know the identity of the engraver. Around September 18, 2009, four engraving orders originally placed with Stonebridge—for which Stonebridge developed art free of charge at Keith Carmichael's request—were instead engraved by TaylorMade. In early 2010, Stonebridge discovered Cutting-Edge was filling engraving orders with another engraver, so Stonebridge stopped sending free sample knives to Cutting-Edge.

In early 2011, Keith Carmichael used the information Massey downloaded about Stonebridge's inside customers to create a mailing list. Carmichael transferred the list to a marketing company, who sent advertising postcards to the inside customers in May 2011, November 2011, and April 2012, which resulted in sales to Cutting-Edge.

## B.    Procedural History

Stonebridge filed a complaint asserting both federal and Arkansas state law claims, invoking federal question and supplemental jurisdiction, see 28 U.S.C. §§ 1331, 1367(a). After a four-day bench trial, the district court issued findings of fact and conclusions of law, dismissing eight of the ten claims and partially ruling in favor of Stonebridge on its fraud and conversion claims. The district court then denied the parties' motions for attorney fees. Stonebridge appeals the partial dismissal of and damages award on the conversion claim, the dismissal of its RICO, ADTPA, and tortious interference claims, and the denial of attorney fees. Defendants cross-appeal

the fraud and conversion judgments on the merits, each damages award, and the district court's attorney fee order.

## II. DISCUSSION

"'In reviewing a judgment after a bench trial, this court reviews the court's factual findings for clear error and its legal conclusions de novo.'" Tussey v. ABB, Inc., 746 F.3d 327, 333 (8th Cir. 2014) (quoting Outdoor Cent., Inc. v. GreatLodge.com, Inc., 688 F.3d 938, 941 (8th Cir. 2012)).

### A. Conversion

In Arkansas, "[t]o establish liability for the tort of conversion, a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owner's rights." Hatchell v. Wren, 211 S.W.3d 516, 521 (Ark. 2005). We review this factual question, see, e.g., Ford Motor Credit Co. v. Herring, 589 S.W.2d 584, 586 (Ark. 1979), for clear error.

#### 1. Inside Customers
#### a. Merits

Defendants contend the district court erred by "[s]pecifically" finding defendants converted Stonebridge's inside customer files.[3] Looking primarily to copyright law from other jurisdictions, defendants argue Stonebridge had no possessory interest in copies of the art it created for its customers. We need not venture outside Arkansas tort law to resolve this issue. In Godwin v. Churchman, 810 S.W.2d 34 (Ark. 1991), a solo accountant, Godwin, joined three other accountants to form their own firm. See id. at 35. After the business relationship turned sour and

---

[3]Despite maintaining their innocence as to conversion, at oral argument, counsel for defendants acknowledged Massey's act was "theft" and Massey "wrongfully took" the files.

Godwin rejected the others' effort to buy him out, the other three accountants resigned. See id. Over a weekend, the three "took furniture, client files in progress, computer diskettes with client information, and financial data including accounts receivable from the office, without giving prior notice." Id.

The Arkansas Supreme Court held Godwin sufficiently alleged a claim of conversion. See id. at 38. The court reasoned Godwin had alleged the other three accountants had "exercised dominion over property in violation of the rights of the owners" where the complaint stated, "the Defendants removed the files, including those originally brought into the practice by Plaintiff Godwin, copied the computer diskettes which were the property of Plaintiffs, took the furniture which was the property of Plaintiffs and took over the Plaintiffs' accounting practice which he had brought into the group." Id.

Defendants contend the Arkansas Supreme Court might have considered only the taking of files and furniture, not the copying of the computer diskettes, to constitute an allegation of conversion. But the court did not single out the diskette copying as any less a conversion than the physical removal of the files and furniture, and we have no reason to assume otherwise. See Holland v. Walls, 621 S.W.2d 496, 497-98 (Ark. Ct. App. 1981) (finding appellee converted appellant's tract books when she made microfilm copies of the books, "exercis[ing] dominion over the property in violation of appellant's right to possession"). Following Godwin and Holland, the district court did not err in concluding defendants converted the copies of inside-customer files created by Stonebridge.

### b. Damages

Stonebridge alleges the district court erred in assessing damages for defendants' inside-customer files conversion. "[T]he amount of damages in a nonjury case is within the discretion of the trial court and cannot be overturned unless clearly

erroneous." Taylor v. Pre-Fab Transit Co., 616 F.2d 374, 375 (8th Cir. 1980). The district court awarded Stonebridge recovery based on defendants' unjust enrichment. See, e.g., Holland, 621 S.W.2d at 499 (remanding to the trial court to calculate damages based on unjust enrichment to the conversion tortfeasor).

Cutting-Edge took inside-customer contact information from the files Massey copied and arranged for solicitation postcards to be sent to Stonebridge's inside customers. The parties stipulated these postcard solicitations resulted in at least $27,300 in sales for Cutting-Edge. Stonebridge argues the number should be increased by about $10,000 for ostensible sales by Cutting-Edge to inside customers before the postcard solicitations. The district court did not include Stonebridge's additional $10,000 because there was "no reliable evidence . . . to support [it]." The district court found Cutting-Edge "earned a 61% net profit of the price of the main knife sold to their end use customers." The district court awarded damages of 61%, which it calculated as $16,380,[4] representing Cutting-Edge's unjust enrichment.

Stonebridge claims the district court clearly erred by not crediting "Exhibit D" to its post-trial brief, which Stonebridge claims supports a higher award. Stonebridge admits it did not introduce Exhibit D at trial, but claims Exhibit D "extracted data from defendants' trial Exhibit 15." Considering our deferential standard of review of damages, see Taylor, 616 F.2d at 375, we hold the district court did not clearly err by discounting evidence compiled in a post trial brief exhibit and thereby holding Stonebridge to the lower stipulated figure.

Defendants assert Stonebridge is not entitled to damages because it did not present sufficient evidence that it had been profitable. But a lost-profit analysis is

---

[4]The district court clearly erred here, because 61% of $27,300 is $16,653. On remand, the conversion award must be adjusted accordingly.

irrelevant here to the district court's calculation of unjust enrichment damages, which may be calculated solely from defendants' gain. See, e.g., Hatchell, 211 S.W.3d at 522. The district court did not clearly err in awarding damages based upon defendants' unjust enrichment.

## 2. Outside Customers

The district court found Massey also downloaded outside-customer files, but the district court did not "[s]pecifically" find defendants converted the outside-customer files and did not award any remedy for these alleged losses. Stonebridge claims this was error. Although a close question, we conclude the district court did not clearly err in not awarding judgment to Stonebridge on the outside-customer conversion claim. See Spirtas Co. v. Nautilus Ins. Co., 715 F.3d 667, 670-71 (8th Cir. 2013) ("This court can affirm on any basis supported in the record.").

"'Conversion is the exercise of dominion over property in violation of the rights of the owner or person entitled to possession.'" Grayson v. Bank of Little Rock, 971 S.W.2d 788, 792 (Ark. 1998) (quoting City Nat'l Bank of Fort Smith v. Goodwin, 783 S.W.2d 335, 337 (Ark. 1990)). The dispositive inquiry is whether defendants, like Stonebridge, were "entitled to possess" the outside-customer files. See id. The outside customers placed orders with Cutting-Edge, paid Cutting-Edge, received knives shipped by Cutting-Edge, and, the district court found, "had no knowledge of who performed the engraving work."[5] The district court further found "[t]he art, proof pages and other items produced in connection [with Stonebridge's] 'outside' customers . . . were shared and disclosed with distributors (including Cutting Edge) and end use customers." Stonebridge sent Cutting-Edge outside-customer art ("free mock-ups") with no restriction. Because Stonebridge freely gave Cutting-Edge the

---

[5]Stonebridge stated at oral argument it was "not challenging the district court's factual findings."

outside-customer art, at least in PDF format,[6] defendants' use of the outside-customer files was not "inconsistent with [Stonebridge's] rights." Hatchell, 211 S.W.3d at 521. The outside-customer art was accessible by Cutting-Edge without restriction, and while Stonebridge complains the Carmichaels "developed" an outside-customer list to "servic[e] Stonebridge's repeat customers," the outside-customer list was merely a list of Cutting-Edge's own customers. Given the absence of an agreement that the defendants could not use the proofs, we affirm the district court on Stonebridge's outside-customer conversion claim.[7]

## B.    Tortious Interference

Stonebridge argues the district court erred by dismissing Stonebridge's tortious interference claim reasoning that "[t]he individuals appearing on [Stonebridge's] customer list were potential customers and the expectation to profit from yet-to-be secured reorders does not constitute a valid business expectancy." We review this question of fact for clear error. See, e.g., Stewart Title Guar. Co. v. Am. Abstract & Title Co., 215 S.W.3d 596, 605 (Ark. 2005) ("[T]he question of whether a valid business expectancy existed was a question for the jury to determine.").

"Some *precise* business expectancy or contractual relationship must be obstructed in order to commit the tort of interference with a business expectancy." Skalla v. Canepari, 430 S.W.3d 72, 81 (Ark. 2013) (emphasis added); see also Stewart Title, 215 S.W.3d at 611 (Brown, J., concurring) (stating the "prospective relationship must be 'certain, concrete and definite'") (quoting Shank v. William R. Hague, Inc.,

---

[6]After observing a demonstration of the PDF-to-CDR conversion process at trial, the district court found this reverse process was "easily" done. We find no clear error in this factual finding.

[7]Arguably, Massey's copying of the outside-customer files was also a conversion, or "theft," as the defendants' counsel bluntly declared.

192 F.3d 675, 689 (7th Cir. 1999)); cf. Stewart Title, 215 S.W.3d at 603 ("Conclusions without the necessary factual underpinnings to support them are not enough to state a cause of action.").

Stonebridge claimed it had a "valid business expectancy" that over half its inside customers, statistically, would place reorders, and that the defendants were aware of this fact. Other than the statistical evidence, Stonebridge does not provide us with "the necessary factual underpinnings to support," id., its claim and does not describe a precise, certain, concrete, or definite business expectancy.[8] See, e.g., id. at 604 (explaining there was "substantial evidence . . . regarding the existence of a valid business expectancy based on the numerous witnesses who testified at trial"); cf. Baptist Health v. Murphy, 373 S.W.3d 269, 282-83 (Ark. 2010) (affirming the trial judge's "specific findings, based on witness testimony, that there were contractual relationships between the appellee physicians and their patients and that these relationships were long term"). For example, Stonebridge does not state how many reorders a customer typically would place, nor whether its relationship with the reordering customers was long-term. Given our deferential standard of review, we find the district court did not clearly err in finding Stonebridge did not establish the existence of a business expectancy under Arkansas law.

---

[8]See Johnson v. City of Shorewood, Minn., 360 F.3d 810, 817-18 (8th Cir. 2004) ("It is not a court's obligation to search the record for specific facts that might support a litigant's claim, and we are not disposed to undertake such a task in this case." (internal citation omitted)).

## C.    Fraud

The Carmichaels and Cutting-Edge argue the district court erred in finding they fraudulently induced Stonebridge to continue sending sample knives after they started filling some of their engraving orders with TaylorMade.

> The tort of fraud or deceit consists of five elements that the plaintiff must prove by a preponderance of the evidence: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance.

Tyson Foods, Inc. v. Davis, 66 S.W.3d 568, 577 (Ark. 2002).

The parties stipulated Stonebridge and Cutting-Edge had no agreement "as to how many or when sample knives would be delivered [or that the sample knives] should be returned." But Mickey Gates testified he and Keith Carmichael had a "mutual agreement" that Stonebridge would provide free samples to Carmichael as an "investment" to secure customer orders for Stonebridge. Stonebridge alleges—and Cutting-Edge disputes—Stonebridge had an "agreement" with Cutting-Edge that "amounted to a 'requirement contract' relationship." But Cutting-Edge stipulates Stonebridge provided the sample knives "for the purpose of solicitation of sales of personalized knives *etched by Stonebridge*." (Emphasis added). The district court found "[t]he Carmichaels and Cutting Edge induced [Stonebridge] to send sample knives to them from the period following July 2009 and did so with little to no intention of using [Stonebridge] as its primary engraver but rather with the intention to switch to using Taylor Made exclusively," and that amounted to fraudulent inducement. Cutting-Edge states the district court erred in its factual finding regarding Cutting-Edge's intent, which we review for clear error.

Although another close question, we conclude the district court did not clearly err. Cutting-Edge made substantial investments in TaylorMade, "fund[ing] the start-up of TaylorMade," suggesting Cutting-Edge would want to ensure itself of a return on its investment by sending as much business as possible to TaylorMade. After September 2009 when TaylorMade started engraving knives, Cutting-Edge's orders placed with Stonebridge rapidly decreased. Mickey Gates testified, "Every year was an increase until 2008. 2008 it started going down, 2009 it took a sharp nosedive, and 2010 it was even to non-existent, to the last order being in December of 2010." Gates further testified, "[T]he problem is Mr. Carmichael never informed us that he had ended the agreement. He just started – he was asking for more samples and then started diverting those samples away." Keith Carmichael responded at trial his "intent was to have two possible suppliers." But Stonebridge emphasizes in its brief, citing the testimony, "Cutting-Edge inadvertently sent proof pages to Stonebridge that were intended for TaylorMade, but when Gates asked about the knives, Carmichael assured Stonebridge repeatedly that the forms in question were for different knives that Stonebridge did not handle. Those assurances were lies, as Gates later figured out." At trial, Gates explained, "[W]e had an investment and expected return on those investment knives. At that point, I knew that [Keith Carmichael] was no longer turning those orders in to us that our samples were providing."

The district court must have given greater credence to Mickey Gates's testimony than to Keith Carmichael's on this issue, and we will not usurp the fact-finder's superior ability to make such assessments. See Tadlock v. Powell, 291 F.3d 541, 546 (8th Cir. 2002) ("We give due regard to the opportunity of the district court to judge the credibility of the witnesses.") The district court did not clearly err by finding Cutting-Edge fraudulently induced Stonebridge to send sample knives while

intending to employ TaylorMade as its engraver on the orders outside-customers placed as a result of seeing the samples.[9]

### D. ADTPA

The district court held defendants did not violate ADTPA § 4-88-107(a)(1), (2), or (10). Stonebridge appeals the district court's conclusion as to subsection (10) only, which prohibits "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). Addressing Stonebridge's ADTPA claim, the district court stated,

> Massey, Taylor, and Taylor Made did not make any representation to the public concerning the goods and services of [Stonebridge] and therefore [Stonebridge]'s claim brought pursuant to [ADTPA] as to these defendants is dismissed.

> In view of the Court's finding that [Stonebridge's] "main" knife is the same as the ones offered by the Carmichaels and Cutting Edge, these defendants' advertisements do not constitute false representation and, therefore, do not constitute a violation of ADTPA. . . . Accordingly, [Stonebridge's] state deceptive trade practices claim against these defendants is dismissed.

Stonebridge generally argues that the district court ignored the catchall provision, § 4-88-107(a)(10), and, without citation to supporting legal authority, Stonebridge alleges defendants' acts of conversion and fraud amount to "deceptive act[s] . . . in business." Defendants counter they did not violate § 4-88-107(a)(10) because "there

---

[9]We also reject the defendants' arguments suggesting the district court erred in awarding Stonebridge $849.60 in damages for four fraudulently diverted engraving orders.

-14-

was no deception, fraud or false pretense concerning the knives being sold."[10]  We review the district court's interpretation of the ADTPA de novo.  See Tussey, 746 F.3d at 333; see also Baptist Health, 373 S.W.3d at 288 ("Our review of this point on appeal requires interpretation of the ADTPA; accordingly, the standard of review is de novo.").

"The elements of . . . a cause of action [under § 4-88-107(a)(10)] are (1) a deceptive *consumer-oriented* act or practice which is misleading in a material respect, and (2) injury resulting from such act."  Skalla, 430 S.W.3d at 82 (emphasis added); see also Forever Green Athletic Fields, Inc. v. Lasiter Constr., Inc., 384 S.W.3d 540, 552 (Ark. Ct. App. 2011) (concluding a party's counterclaim under § 4-88-107(a)(10) "fail[ed] to assert that [defendant] engaged in any type of consumer-oriented act or practice"); cf. Wallis v. Ford Motor Co., 208 S.W.3d 153, 161 (Ark. 2005) (explaining that the ADTPA provided the Arkansas Attorney General remedial powers "in order to protect consumers").  Stonebridge has failed to establish that defendants' acts of conversion and fraud were consumer-oriented or impacted consumers in any way. The ADTPA, as interpreted by the Arkansas courts, does not apply to deception and fraud claims regarding business between a manufacturer and its distributor when consumers are not deceived or defrauded.  Stonebridge does not show or argue a "consumer-oriented," Skalla, 430 S.W.3d at 82, "unconscionable, false, or deceptive act or practice," § 4-88-107(a)(10).  Accordingly, the district court did not err in dismissing Stonebridge's ADTPA claim.

---

[10]In a letter filed pursuant to Federal Rule of Appellate Procedure 28(j), defendants suggest Stonebridge did not plead a claim under § 4-88-107(a)(10). Although Stonebridge did not cite the statute by number in its complaint, after making its factual allegations, Stonebridge asserted defendants "engaged in an unconscionable, false, or deceptive act or practice in business, commerce, or trade," reciting the standard in § 4-88-107(a)(10).

## E.    RICO

RICO states, "It shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" includes "a host of so-called predicate acts," Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008), including those "indictable under  [18 U.S.C.] section 1341 (relating to mail fraud) [and] section 1343 (relating to wire fraud)," 18 U.S.C. § 1961(1)(B).  RICO allows a person victimized by a racketeering scheme to bring a civil action, see id. § 1964(c), and "provides for drastic remedies"—"a person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 233 (1989).

"[I]nherent in the statute as written" is the fact civil actions under § 1964(c) are typically brought against "respected and legitimate enterprises" "rather than against the archetypal, intimidating mobster." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985) (quotation and marks omitted).  But "RICO 'does not cover all instances of wrongdoing.  Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'" Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (quoting Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir. 2006)).  "We have in the past rejected attempts to convert ordinary civil disputes into RICO cases. . . .   RICO was not intended to apply to 'ordinary commercial fraud.'" Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1029 (8th Cir. 2008) (quoting Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank, 934 F.2d 976, 981 (8th Cir. 1991)).

"A violation of § 1962(c) requires appellants to show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009) (quoting Sedima, 473 U.S. at 496).

[T]he definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern "*requires* at least two acts of racketeering activity," not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern."

Sedima, 473 U.S. at 496 n.14 (quoting § 1961(5)). "[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of *continued* criminal activity." H.J. Inc., 492 U.S. at 239 (second emphasis added). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." Id. at 242. "Continuity can be shown by related acts continuing over a period of time lasting at least one year (closed ended continuity), or by acts which by their very nature threaten repetition (open ended continuity)." United States v. Hively, 437 F.3d 752, 761 (8th Cir. 2006) (internal citation omitted).

"'The determination of a pattern of racketeering activity is a factual determination,'" Handeen v. Lemaire, 112 F.3d 1339, 1353 (8th Cir. 1997) (quoting Lambert Plumbing, 934 F.2d at 980), which we review for clear error. The district court did not clearly err in finding Stonebridge failed to prove the RICO continuity element.

Stonebridge alleges defendants committed three sets of predicate acts that violated RICO. We address each in turn. First, Stonebridge claimed defendants "used the mails to cause advertisements and promotional materials to be sent to Plaintiff's customers, which contained deliberately misleading statements concerning the source or origin of the knives they sold to such customers." The district court found no false representation in the defendants' advertisements—a finding Stonebridge does not

-17-

appeal. Because the advertisements "did not contain or constitute false representations," the district court concluded, based on <u>Dahlgren v. First Nat'l Bank of Holdrege</u>, 533 F.3d 681, 689 (8th Cir. 2008) ("'Though mail fraud can be a predicate act, mailings are insufficient *to establish the continuity factor* unless they contain misrepresentations themselves.'" (emphasis added) (quoting <u>Wisdom v. First Midwest Bank of Poplar Bluff</u>, 167 F.3d 402, 407 (8th Cir. 1999))), Stonebridge did not establish the RICO continuity factor.

Stonebridge claims the district court made an error of law, quoting <u>Bridge</u>, 553 U.S. at 647 ("The gravamen of the [mail fraud] offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies *the mailing element*, even if the mailing itself contains no false information." (emphasis added) (internal citation and marks omitted)). But the quotation from <u>Bridge</u> is inapposite in this context, because it addressed "the mailing element," while the district court addressed "the continuity factor." <u>See</u> <u>Primary Care Investors Seven, Inc. v. PHP Healthcare Corp.</u>, 986 F.2d 1208, 1215 (8th Cir. 1993) (rejecting a "letter [that] evinces no fraud" as a possible "predicate act[] purportedly marking the beginning . . . of the alleged scheme"). The district court did not err by finding defendants' solicitation postcards, which contained no misrepresentations, could not be used to establish the continuity factor.

Second, Stonebridge contends Cutting-Edge's receipt of the sample knives it fraudulently induced Stonebridge to send via United Parcel Service amounted to mail fraud. The district court found Cutting-Edge fraudulently induced Stonebridge to send the 6,476 knives from July 2009 to March 2010, a time period too short to satisfy the continuity factor. <u>See</u> <u>Hively</u>, 437 F.3d at 761 (explaining a "closed ended continuity" claim, like the one brought here, must span "a period of time lasting at least one year").

Finally, Stonebridge claims Massey's emailing Stonebridge's converted files from TaylorMade to Cutting-Edge between November 2010 and March 2011 and Cutting-Edge's emailing the customer list in May 2011 constituted wire fraud. Even if we were to consider the two sets of actions together, we do not find "related acts *continuing over* a period of time lasting at least one year," id. (emphasis added), nor do we find the "'organized, long-term, habitual criminal activity,'" Crest Constr. II, 660 F.3d at 353 (quoting Gamboa, 457 F.3d at 705), over a "substantial period of time," H.J. Inc., 492 U.S. at 242, contemplated by RICO. See, e.g., Primary Care Investors, 986 F.2d at 1215-16 (stating "[m]any cases in which courts have found a 'substantial period of time' have involved schemes extending for a number of years" and deciding eleven months was not a substantial period). Stonebridge has "presented evidence sufficient to establish violations of state law," but it has "not presented sufficient evidence to satisfy the more onerous requirements of RICO." Craig Outdoor, 528 F.3d at 1029.[11]

**F.    Attorney Fees**

Both parties appeal the district court's denial of attorney fees. We affirm the district court's denial of attorney fees to Stonebridge under RICO, see 18 U.S.C. § 1964(c), and the ADTPA, and to defendants on Stonebridge's conversion and fraud claims.

---

[11]We have considered Stonebridge's remaining RICO arguments and find them to be without merit. See Johnson, 360 F.3d at 817-18; Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002) (stating ordinarily we do not reach issues argued for the first time on appeal).

## III.  CONCLUSION

We affirm in part and remand to the district court for reassessment of the amount of damages due for conversion of the inside-customer files.

_____